**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Alvaro Julio ECHAVARRIA–OLARTE,
Defendant–Appellant.**

**No. 88–1321.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 15, 1990.

Decided June 7, 1990.

As Amended Aug. 17, 1990.

Robert J. Beles and Thomas M. Kummerow, Law Offices of Robert J. Beles, Oakland, Cal., for defendant-appellant.

Rory K. Little and Mary E. Pougiales, Asst. U.S. Attys., San Francisco, Cal., for plaintiff-appellee.

Before BOOCHEVER, WIGGINS and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Alvaro Julio Echavarria–Olarte (Echavarria) appeals his conviction of two conspiracies to import and distribute cocaine in the United States and of interstate and foreign travel in aid of a racketeering enterprise. We affirm his convictions.

## PROCEEDINGS

Echavarria was indicted together with Simon Castorena Sotelo, Raymond Frederick Lane, Albert Cruz Alaniz, Jesus Longoria Moreno, Carlos Rodriguez Sotelo, Carlos Leoncio Tafich, and John Doe I, a/k/a "Alvarado" for conspiracy to import cocaine into the United States in violation of 21 U.S.C. § 963; for conspiracy with the same defendants to possessing with intent to distribute and to distribute five tons of cocaine in California in violation of 21 U.S.C. § 846; and, in violation of 18 U.S.C. §§ 1952 and 2, of travelling from Colombia to California, from California to Texas, from Texas to Colombia, and from Florida to Texas to carry on the enterprise of importing and distributing of cocaine and of shipping boxes and labels from California to Medellin, Colombia for the same purpose. The conspiracy was alleged to have begun not later than February 18, 1987 and continued through July 26, 1987. Only Echavarria stood trial. He was found guilty of both conspiracy counts and six of the travel counts.

## FACTS

Alvaro Julio Echavarria–Olarte was born in 1937 in Medellin, Colombia and was educated in that country, although he also studied at the Philadelphia Textile Institute and is familiar with English. Coming from a wealthy family, he engaged in a variety of enterprises and investments in Colombia, including textile manufacturing, construction, banking, and farming, and according to his own testimony enjoyed an income of $1 million per month in the late seventies. In 1980, however, he underwent reverses and entered bankruptcy. The experience left him with the desire to recover "some assets."

On May 7, 1987 he met by pre-arrangement at Los Angeles Airport with a group of six men who, since February 1987, had been plotting to smuggle cocaine into the United States. Among these men were Simon Castorena Sotelo and Michael Moren. Moren had been selected to be the pilot of the plane that would carry the cocaine. Castorena had paid for a month's training for him to learn how to fly the large plane that would be used. Moren was in fact an undercover agent of the Drug Enforcement Administration.

At Los Angeles Airport the group inspected the chosen type of large plane, a Gulfstream 3 jet, and Echavarria measured the height of the cargo door above the tarmac to see if the door could be reached without a ladder. The group then flew in a small plane to San Francisco.

Arriving in San Francisco, the group drove to Milpitas. En route, Echavarria told Moren that he had been talking to financiers, middlemen, and suppliers, and that "Piedrajita," "Gaitano," and "Felitia," had approved the cocaine smuggling plan Echavarria had presented to them and now wanted to participate in it. Echavarria further told Moren that he had prepared the way for the smuggling flight to begin at the airport in Cartagena, Colombia, by arranging matters with the military, police, and civilian authorities there. (In a subsequent conversation Echavarria informed Moren that it cost $200,000 in bribes to fix the Cartagena airport). The cocaine, Echavarria said, would be delivered by helicopter to Cartagena.

In Milpitas the group inspected Scooter Juice, a business owned by Castorena and proposed as a cover for the smuggling operation. Castorena provided Echavarria with the kind of box that should be used to ship the cocaine, and it was agreed between them that the boxes would be dis-

guised as boxes belonging to "DHL," an overnight courier company. Castorena explained that a 3–ton truck owned by the business would pick up the boxes at Butler Aviation in San Francisco when the flight arrived from Cartagena. When the truck returned to Scooter Juice, the cocaine would be removed and put in two smaller pickup trucks. In these the cocaine would be taken to Los Angeles. There, five different pickups from five different locations would carry the cocaine to five safe houses. Echavarria was the person to whom this information was directed, for, according to Castorena, he "seemed to be the one who approved everything" on behalf of the backers of the scheme in Colombia. Castorena told Moren that the purpose of showing Echavarria his business and home was to impress him with his stability, so that Echavarria would know he wouldn't run away with the cocaine after it was flown in.

Late that night or early the next morning Echavarria placed a call to South America and after completing the call told Moren and other members of the group that he had been "authorized to release $300,000 of the Colombians' cash that week."

The next day Echavarria instructed Moren on what he should do on flying the plane into Cartagena to pick up the cocaine. Echavarria wanted Moren to be able to communicate to him on the ground on radio frequencies other than those to which the control tower was set. Echavarria gave Moren $1,000 to buy two radios with transmitters. Moren bought them. Later Echavarria provided Moren with the frequencies to be used in the transmissions, and Echavarria recorded these frequencies in a small notebook called "Agenda" that he kept.

Echavarria left California for Texas and then returned to Medellin. He came back to the United States in July 1987 and on July 14, 1987 met Castorena and Moren in Los Angeles. Echavarria had sent Castorena a map of the Cartagena airstrip. Echavarria now discussed in detail with Moren where he should park the plane and how it would be loaded with the cocaine. Echavarria said that he had discussed the plan with Nicholas, his partner in Medellin

(subsequently identified as Nicholas Ramirez). He also told Moren that Jairo Correa had called him at home in Medellin and set up a meeting at which they discussed the use of the Gulfstream 3 to ship Correa's cocaine into the United States from an oil company strip at Barrancabermeja, Colombia. Echavarria knew Correa to be a very good source of cocaine. Echavarria had also discussed the plan with Gustavo Escobar, identified by him as "the major cocaine dealer in South America." This person had learned of the operation and thought it safe, but was "a little leery of getting into it on the first trip." Echavarria told Castorena and Moren that if in fact "anything went wrong at all," "the people from Colombia would kill him." Piedrajita, with whom he had first been dealing, had recently been kidnapped.

In addition to discussing the planned Cartagena–San Francisco flight, Echavarria told Moren of a second operation that was going to raise the money—about $225,000—necessary to rent the Gulfstream 3 jet. The second operation would smuggle 500 pounds of cocaine from Colombia into Atlanta, Georgia, yielding a profit of $250,000. Echavarria disclosed that he was engaged on this project with Alberto Alaniz, Raymond Costello, and Francisco Serrano. Moren was asked to find a small airplane for the flight, a King or an Arrow Commander.

On July 26, 1987 Echavarria was arrested in Monterey, California before any cocaine was delivered pursuant to his plans.

## ISSUES ON APPEAL AND ANALYSIS

### 1. *The Selection of the Jury*

In the selection of the jury the government used each of the six peremptory challenges allowed it. Echavarria used nine of the ten challenges allowed him and then passed without using his final challenge, thereby accepting the jury. The jurors were sworn. The selection of two alternates began. The government did not exercise any challenge. Echavarria exercised the single challenge allowed him. Juror Lawson was then selected as the first alternate.

 At this point Juror Estereito asked to be excused on the ground of financial

hardship. The district court indicated that if Estereito were excused he would be replaced with the first alternate, Juror Lawson. After discussion the district court agreed that Estereito would not be excused until three alternates had been selected; each side would have one additional peremptory challenge for use against any prospective alternate juror, including Juror Lawson; after selection of the three alternates Estereito would be excused and would be replaced by whomever was then the first alternate. This procedure was followed. Echavarria made no challenge to any of the three alternates. The district court excused Estereito and replaced him with Lawson.

Echavarria objected to this proceeding at the time and continues to object on appeal. He argues that the district court violated the rule set out in *United States v. Turner*, 558 F.2d 535, 538 (9th Cir.1977). *Turner* held that "acceptance of a panel cannot be deemed a waiver of a peremptory challenge in respect of a person who was not a member of the panel at the time the jury was accepted. Thus, whenever the composition of the panel has changed, the defendant may exercise any of his unexpended peremptories to excuse the new prospective juror or jurors." *Id.* (footnote omitted).

There was no violation of *Turner*. The district court gave Echavarria an extra peremptory so that he had one peremptory to exercise upon whomever was selected to succeed juror Estereito and he had another peremptory to exercise on the alternates.

■ At the trial Echavarria's objection was put in different terms. It was an objection to the district court excusing Estereito. The general rule has been succinctly stated: "When allowable under Rule 24(c), the substitution decision is committed to the sound discretion of the trial judge." *United States v. Jones*, 534 F.2d 1344, 1346 (9th Cir.), *cert. denied*, 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 108 (1976). The key phrase is "when allowable under Rule 24(c)."

Rule 24(c) of the Federal Rules of Criminal Procedure permits the substitution of alternate jurors for jurors who "become or are found to be unable or disqualified to perform their duties." In *Jones*, the juror had turned out to be a drunk. It is not so clear that a juror claiming financial hardship is unable to perform his duty as a juror. It is, indeed, a close question, but it is the kind of question peculiarly suited to the exercise of discretion by the trial judge. Even if the error claimed at trial had been put in this form on appeal, we would not find reversible error in the trial court's excusing of Estereito on this ground.

### 2. *The Wiretap Evidence*

On April 24, 1987, two months after the government had begun an investigation of the cocaine smuggling conspiracy, it received authorization from District Judge Conti to tap the telephones of Raymond Lane and Simon Castorena Sotelo. Thirty days later the government applied for an extension of the wiretaps. The extension was granted by Chief Judge Peckam. On June 19, 1987, the government applied for a second 30–day extension of the wiretaps and, on July 17, 1987, the government applied for a third extension. These extensions were granted by Chief Judge Peckham. Echavarria unsuccessfully moved to suppress the evidence obtained as a result of the wiretaps and now appeals, contending that the wiretap evidence was inadmissible at his trial.

■ Echavarria argues that the wiretaps were not necessary. We review deferentially for an abuse of discretion the finding of necessity by the district court authorizing the wiretapping. *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir.1986) (per Kennedy, J.). The affidavit of the DEA agent that obtained the first authorization set out in detail Michael Moren's relations with Simon Castorena Sotelo and Ray Lane: that the latter two had hired Moren to be their pilot in flying in to the United States a total of three tons of cocaine and had agreed to pay for his flight training and the rental of his airplane and to give $200,000 apiece to him and his copilot; that Moren had been introduced by the two named conspirators to three men who were involved in the scheme but whose last names were not given; that the two named conspirators evaded Moren's questions about who the suppliers of cocaine were;

that Moren was told that the two conspirators owned a company named Scooter Juice and that this company had recently acquired nine pager telephone numbers that would be useful in the delivery and distribution of the drugs; that Castorena had met with a man identified by surveillance officers as Elmus Billingsley, known to be a narcotics dealer in California; that the flight plan for the cocaine importation from South America had been agreed to; that pen registers, recording outgoing numbers dialed from a telephone, had been used, pursuant to federal court order, on the telephones of Raymond Lane, Scooter Juice, Inc., and Irma Fuentes (a telephone subscriber at Castorena's home) and that calls had been traced to several identified persons in the United States with criminal histories, but that no telephone calls to South America had been recorded.

Specifically under the heading, "Need for Interception," the affidavit stated that no normal investigative techniques were reasonably available or likely to succeed in the identifying of the suppliers who were "apparently located in Colombia and/or Venezuela." Nor was any such technique reasonably available or likely to succeed in identifying the persons to whom the cocaine would be distributed once it was imported. The identifies of the suppliers had been closely guarded. Moren, relegated to the role of pilot, was unlikely to be told their names or to meet them. As to distribution, the named conspirators had indicated to Moren that they planned to effect the distribution in 24 hours and would therefore have all the details arranged ahead of time. Surveillance after the arrival of the cocaine would be ineffective to prevent its distribution.

We have upheld the suppression of wiretap evidence where the wiretapping was found to be unnecessary because of an undercover agent's penetration of a criminal conspiracy. *E.g., United States v. Simpson,* 813 F.2d 1462, 1472 (9th Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987); *United States v. Ippolito,* 774 F.2d 1482, 1487 (9th Cir.1985). But our standard is "a practical and common

sense approach." *Id.* at 1486. In the present case, such a practical and common sense approach was taken by the two district judges who approved the wiretaps and by the district court that refused to suppress the information obtained from it. Moren had penetrated the drug ring as far as he could. No likelihood existed that he could get much more information than he had. Although he eventually met Echavarria and obtained some clues as to his possible suppliers (and this information was disclosed on the May 22, 1987 application for an extension) Moren had no definite information as to the ultimate suppliers. The two known conspirators could not have been brought before a grand jury without destroying the government's chance of catching more of the main players. On appeal, Echavarria argues that cultivation of informants plus surveillance would have discovered part of the distribution network. But as the affidavit pointed out, there was no reason for the known conspirators to meet their distributors prior to delivery, and there was no candidate to be an informant who was plugged into the entire distribution network. The only effective way of stopping the distributors before they had time to pickup the cocaine or were alerted to the government's knowledge was by identifying them in advance of the arrival of the cocaine. Moren was not in on this part of the conspiracy. As to both the suppliers and distributors, the telephone taps were necessary in order to prevent the completion of the crimes and to apprehend the criminals.

■ Echavarria presents the separate objection that one application was misleading. He argues that the May 22, 1987 application of the government for an extension of wiretaps was presented in such a way as to artfully mislead the district court. His contention is based on the fact that at page 35 of the forty-page affidavit it was disclosed that it was likely that Moren would not be able to fly the plane from Colombia because of a policy of the Colombian government against allowing a United States agent to enter the country for such a purpose. Echavarria contends that if there was to be "no flight," there could have been no distribution, and so no necessity to identify the distributors.

Echavarria misreads the affidavit. After disclosing the likelihood that Moren may become ineffective, the affidavit continues on the assumption that a substitute pilot will be found by the ring. Earlier discussions by the conspirators with Moren had indicated that they were interested in other pilots. There was no reason to believe that the entire conspiracy would stop if Moren withdrew. The affidavit candidly disclosed that Moren might no longer be involved. There was no manipulation of the court.

■ Even if we were to assume, arguendo, that the challenged wiretaps were invalid, they were, to the extent that they contradicted statements made on direct examination, admissible for impeachment purposes. *United States v. Havens*, 446 U.S. 620, 624, 100 S.Ct. 1912, 1915, 64 L.Ed.2d 559 (1980); *Walder v. United States*, 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954). The remainder of the wiretap evidence was admissible for impeachment purposes to contradict statements made by Echavarria on cross-examination since the prosecutor's line of questions eliciting these statements were "proper cross-examination reasonably suggested by the defendant's direct examination." *Havens*, id., at 627, 100 S.Ct. at 1917; *see also United States v. Issacs*, 708 F.2d 1365, 1370–71 (9th Cir.), *cert. denied*, 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983).

### 3. The Admission of Expert Testimony on the Medellin Cartel

The government offered as an expert witness Errol Chavez, an agent of the DEA in charge of all foreign drug investigations and specifically responsible for a program investigating drug importation from Medellin. Chavez's further qualifications were that he had opened a DEA office in Medellin and been the resident agent there in 1981 and 1982 and that, before his appointment in 1987 to his post in Washington, he had investigated smuggling from Medellin to Atlanta, Georgia.

Chavez's testimony was substantially as follows: The Ochoa family was one of the principal families involved in shipping tons of cocaine to the United States. In 1982 as the result of a kidnapping of Marta Ochoa

Vasquez, the sister of Jorge Ochoa Vasquez, the major cocaine traffickers of Colombia and outside Colombia who were willing to come met in Medellin and decided to work together. "The Medellin Cartel" was a name created by the DEA to describe this group of traffickers who, although they had separate organizations, worked together. Pablo Escobar and Gustavo Gaviria were members of the Cartel. Octavio Piedrajita was "often identified as a Cartel member" but "operated quite differently from Pablo Escobar, Jorge Ochoa Vasquez and Gustavo Gaviria." He was threatened by other narcotics groups for not paying his debts and was at one point kidnapped. Very recently he had been kidnapped again and killed.

The Cartel had "a lot of control" over "the cocaine activities within the city of Medellin." After they heard of a deal involving export from Medellin they were apt to contact those involved. When they met with such smugglers they were serious about the business and did not drink alcohol. Within Colombia the Cartel used helicopters to transport the cocaine. In the summer of 1987 there was an established smuggling route from Medellin to San Francisco, which brought in cocaine by the ton per month. For smuggling purposes the Cartel preferred an Air Commander 980 or 1000. It was common for the group to ship 1200 kilograms and as much as five tons of cocaine into the United States.

The Cartel ruled by intimidation. Those they could not intimidate they bribed. If people did not conform to their purposes "the Medellin have been known to kill." The number killed was "quite high." The Cartel not only intimidated those involved in trafficking cocaine but "they go after the family members and torture them also."

Chavez was offered by the government "as an expert on the subject of the operations of the Medellin and Cali Cocaine Cartels." His testimony was objected to as a surprise; as based on cumulative hearsay; as irrelevant; and as prejudicial. It is now denounced on appeal as an attempt to establish Echavarria's guilt by association. We focus, first, on whether its admission

was an abuse of discretion by the district court. *United States v. Kinsey*, 843 F.2d 383, 388 (9th Cir.), *cert. denied*, 487 U.S. 1223, 108 S.Ct. 2882, 101 L.Ed.2d 916 (1988); *United States v. Christophe*, 833 F.2d 1296, 1300 (9th Cir.1987).

■ At the point at which Chavez was qualified as an expert, it was reasonable for the court to believe that his special knowledge of drug operations in Colombia would help the jury understand the role that other testimony had already established Echavarria as playing in the smuggling operations. He was clearly dependent on others in Medellin for money and for cocaine. Special knowledge of who these persons were would contribute to an appreciation of Echavarria's activities. Chavez's testimony, however, should have been confined to persons and acts that could be tied to the two smuggling operations with which Echavarria was charged. Testimony as to other matters was irrelevant and likely to be prejudicial.

The Medellin Cartel, as described by Chavez, was a loosely-related association of persons involved in the financing, supplying and transporting of cocaine being smuggled into the United States. Not all its "members" were in Medellin or even in Colombia. Those regarded as "members" had "their own organizations." In the aggregate the Cartel had "thousands" of employees. No hierarchy, no central decision-makers were identified by Chavez as controlling these thousands or determining the degree of cooperation that was required to be a member. Octavio Piedrajita was, for example, described as sometimes being in the Cartel, sometimes not. Given the floating character of its membership, "the Medellin Cartel" was relevant to Echavarria's trial only if his actions could be related to specific "Cartel members."

Chavez did indeed identify Piedrajita, a person with whom Echavarria had dealt in trying to arrange the San Francisco operation; but by Chavez's own testimony Piedrajita sometimes operated outside the Cartel. A number of persons mentioned by Echavarria as involved with his plans were not identified by Chavez; among those in Medellin whom he did not identify were Echavarria's partners, Nicholas Ramirez, and his supplier, Jario Correa.

■ Chavez's testimony on "the Medellin Cartel" did not bear squarely on any part of the Cartagena–San Francisco operation that was the main plot and his testimony did not bear on the Atlanta plot. Consequently the testimony as to the methods of "the Cartel" was irrelevant. It was also prejudicial. The testimony about Cartel members initiating contacts, being businesslike, avoiding alcohol, and preferring airplanes was harmless. But the testimony attributed to "the Cartel" methods of enforcing its will—bribery, torture, murder— that are despicable; and of course the overall objectives of "the Cartel"—the massive smuggling of cocaine into this country— was an evil enterprise. To the extent that the government's presentation of Chavez implicitly associated Echavarria with the Cartel, Echavarria was prejudiced. There was a substantial discrepancy between the government's offer and Chavez's actual testimony. The testimony on the Medellin Cartel turned out to have little probative value and much prejudicial effect. Once admitted, it should have been struck.

■ We address a second question: was the evidence of Echavarria's guilt so overwhelming that the admission of Chavez's testimony on the Medellin Cartel was harmless error? If the evidence was such, then the government's attempt at overkill should not cancel out the rest of the government's case. In *United States v. Valle–Valdez*, 554 F.2d 911, 916 (9th Cir. 1977), we noted that "[e]rrors in such matters as ... rulings on the admissibility of evidence where Fourth Amendment claims are not involved ... have been considered 'non-constitutional.'" *See also Dowling v. United States*, —— U.S. ——, 110 S.Ct. 668, 674–75, 107 L.Ed.2d 708 (1990). In this circuit, non-constitutional errors are measured against the more-probable-than-not standard. *Valle–Valdez*, 554 F.2d at 916. We must reverse the defendant's conviction unless it is more probable than not that the prejudice resulting from the error did not materially affect the verdict. *People v. Cepeda*, 851 F.2d 1564, 1567 (9th Cir.1988); *United States v. Binder*, 769 F.2d 595, 601–02 (9th Cir.1985).

The facts establishing Echavarria's participation in the conspiracies have been set out. The facts show him deeply involved. The facts were established at trial by the testimony of the undercover agent who participated in numerous meetings with the conspirators, including three meetings with Echavarria himself. The undercover agent's credibility was not challenged. His testimony was corroborated by two recordings he made of his meetings with Echavarria and by some of the notations made by Echavarria himself in his "Agenda" notebook. Echavarria himself took the stand and did not deny the meetings or conversations with the agent. His defense consisted in attempting to explain his words and actions as attempts "to impress" the agent and Castorena. The motive for such a charade—a charade that included, for example, procuring radios and transmitters and noting the frequencies to be used by Moren flying into Cartagena—was never explained. In contrast, the motive for his involvement in the drug schemes—to regain a portion of his lost wealth—was established by Echavarria's own testimony on the stand. It is not only more probable than not that the tainted testimony did not materially affect the verdict: no reasonable jury, on the properly-admitted evidence before it, could have done other than convict.

AFFIRMED.