**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Sharon Ann RAHM, Defendant–
Appellant.**

**No. 92–10429.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 1993.

Decided May 11, 1993.

---

Brian P. Berson, Asst. Federal Public Defender, San Francisco, CA, for defendant-appellant.

Martha Boersch and Harry Litman, Asst. U.S. Attys., San Francisco, CA, for plaintiff-appellee.

Before FLETCHER, REINHARDT, and NOONAN, Circuit Judges.

REINHARDT, Circuit Judge:

Sharon Ann Rahm appeals her conviction on charges of possession of counterfeit currency and of attempting to pass counterfeit currency, both in violation of 18 U.S.C. § 472. We hold that the district court erred in excluding expert testimony proffered by Rahm, and reverse and remand.

I

On August 3, 1991, Rahm attempted to purchase a three-dollar box of tea from the Canton Bazaar in San Francisco using a counterfeit $100 bill. The manager of the store recognized the bill as counterfeit, and called the authorities. Although the manager told Rahm more than once that there were some problems with the $100 bill, she remained at the store for fifteen minutes or more, waiting for change or the return of the bill. Rahm had twenty-five dollars in genuine cash in her possession, but she never offered to take back the $100 bill and pay for the tea with this other money. The manager testified at trial that Rahm told him she had received the $100 bill from a bank a few days before.

Responding to the manager's calls, two police officers arrived and arrested Rahm. On searching her purse, the officers recovered ninety-eight additional counterfeit $100 bills. After waiting several hours at the police station, Rahm was questioned by a Secret Service agent. She signed a statement that she had found the ninety-nine bills at a bus stop and that she thought the money was real. Although this written statement includes her asserted belief that the currency was genuine, the agent states that when questioned orally, she refused to answer whether she knew the money was counterfeit.[1]

After a two-day trial, Rahm was convicted of possession of counterfeit currency and attempting to pass counterfeit currency. Al-

---

1. Neither Rahm's written statement nor the agent's statement that she refused to answer a question regarding knowledge were admitted at trial. We recite these facts only as they bear upon the district court's pretrial decision to exclude expert testimony.

though she unsuccessfully sought to call an expert witness to testify in her defense, ultimately Rahm rested following the prosecution's case, without introducing any evidence in her own behalf. In argument, her counsel questioned the adequacy of the government's proof that Rahm knew the bills were counterfeit. Knowledge that the currency is counterfeit is an element of both possession and attempting to pass. Lack of knowledge was Rahm's sole theory of defense.[2]

During the government's case, a Secret Service special agent testified to the quality of the counterfeit bills. He explained what distinguished the ninety-nine bills from genuine currency, identifying the presence of microdots in the printing, the absence of colored security fibers in the paper, and the identical serial numbers on multiple bills. The agent further testified that he had seen both higher-quality and lower-quality counterfeit bills successfully passed off as true currency. On cross-examination, the agent agreed that unsuspecting people have accepted, as genuine, phony bills of the same quality as those in Rahm's purse.

## II

Prior to trial, Rahm gave notice, pursuant to Fed.R.Crim.P. 12.2(b), of her intention to introduce the testimony of Dr. Arvalea Nelson, a psychologist, as to her evaluation of Rahm. Rahm intended to offer the testimony in support of her defense that she did not know the bills were counterfeit.

In examining the defendant, Nelson administered two standardized tests, the Wechsler Adult Intelligence Scale—Revised (WAIS–R) and the Minnesota Multiphasic Personality Inventory (MMPI). The results of the WAIS–R revealed that Rahm's intelligence was roughly average; however, her scores on two subtests, Picture Completion and Picture Arrangement, were significantly below average. On both subtests, Rahm showed a "consistent tendency ... to overlook important visual details." Nelson concluded that Rahm's performance on the two subtests suggested "difficulty with visual perception." From the MMPI results, Nelson further concluded that Rahm's overall per-

sonality style might be marked by lack of insight.

The government moved in limine to exclude Nelson's testimony, disputing its relevance and arguing that Nelson's evaluation revealed no medically-recognized mental disorder or defect. The district court granted the motion in an oral ruling the day before trial. On appeal, Rahm challenges this decision to exclude Nelson's expert testimony regarding Rahm's perceptual difficulties.

## III

Under Fed.R.Evid. 702, an expert may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." In *United States v. Amaral*, 488 F.2d 1148, 1153 (9th Cir.1973), we outlined four criteria to determine the helpfulness of expert testimony: 1) qualified expert; 2) proper subject; 3) conformity to a generally accepted explanatory theory; and 4) probative value compared to prejudicial effect. Although we decided *Amaral* prior to the enactment of the Federal Rules of Evidence, we have continued to apply these four factors in determining the admissibility of expert testimony under Fed.R.Evid. 702. *See, e.g., United States v. Miller*, 874 F.2d 1255, 1266 (9th Cir.1989); *United States v. Christophe*, 833 F.2d 1296, 1299 (9th Cir.1987). *Cf. United States v. Fleishman*, 684 F.2d 1329, 1337 n. 5 (9th Cir.) (reserving issue whether *Amaral* survives Rule 702 enactment, but noting Sixth Circuit post-enactment adoption of *Amaral* factors), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982).

We have sometimes described our standard of review in the area of expert testimony as "abuse of discretion" and sometimes as "manifest error." *Compare, e.g., United States v. Barker*, 942 F.2d 585, 589 (9th Cir.1991) (abuse of discretion) *with United States v. Sinigaglio*, 942 F.2d 581, 584 (9th Cir.1991) (manifest error). On occasion, we have used both characterizations. *See, e.g., United States v. Arvin*, 900 F.2d 1385, 1389 (9th Cir.1990) (admission or exclu-

---

**2.** In contending that she did not know the money was counterfeit, Rahm necessarily contested the government's proof of intent to defraud, an element of attempting to pass counterfeit currency.

sion of expert testimony "is reversible only for abuse of discretion or manifest error"), *cert. denied,* 498 U.S. 1024, 111 S.Ct. 672, 112 L.Ed.2d 664 (1991); *Miller,* 874 F.2d at 1266 ("[w]e review ... decisions to admit or exclude expert testimony for abuse of discretion and reverse only for manifest error"); *Christophe,* 833 F.2d at 1299 ("we reverse only if the district court abused its wide discretion or committed manifest error").

We note that general adoption of the "abuse of discretion" characterization would bring this area into line with the rest of our law of evidence. *See, e.g., United States v. Rohrer,* 708 F.2d 429, 432–34 (9th Cir.1983) (employing general standard to address several evidentiary issues, including exclusion of proffered expert testimony). In a recent en banc opinion, we employed the "abuse of discretion" characterization without directly describing our standard of review. *See United States v. Aguon,* 851 F.2d 1158, 1171 (9th Cir.1988) (en banc) ("[t]here was no abuse of discretion" in excluding proffered expert testimony). The "manifest error" characterization apparently emanates from a Supreme Court decision preceding the judiciary's efforts to settle on a limited number of review characterizations. *See Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). There appears to be no practical difference between the two verbal formulae, so their vestigial coexistence serves no obvious purpose. Accordingly, it would be sensible to settle upon a uniform practice of characterizing our standard of review as "abuse of discretion" and abiding by it in all future cases. In view of *Aguon,* we believe it appropriate to adopt that approach, although for purposes of this opinion, it makes no difference which of the two terms—"abuse of discretion" or "manifest error"—we use.

■ Generally, a district court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the facts. *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359 (1990). In the specific area of expert testimony, we have held that a district court errs when it fails to exercise its discretion as the result of applying an erroneous legal principle. *See United States v. Awkard,* 597 F.2d 667, 670 (9th Cir.) (reversing where trial court erroneously concluded admission of expert testimony was *required* under appellate precedent), *certs. denied,* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116, 444 U.S. 969, 100 S.Ct. 460, 62 L.Ed.2d 383 (1979); *United States v. Erskine,* 588 F.2d 721, 722 (9th Cir.1978) (reversing where exclusion based on erroneous conclusion that capacity to form intent irrelevant). Here, we must examine certain legal principles upon which the district court's determination appears to rest.

### A

■ In announcing its ruling on the government's motion to exclude Nelson's testimony, the district court stated that it did not think that the proffered testimony met the "threshold" for admission under Rule 702. Beyond this conclusory statement, however, the court provided only the sparest of reasons for its ruling. The court did not address specifically any of the *Amaral* factors or indicate which it felt were not satisfied by the proffered testimony regarding Rahm's difficulty with visual perception. We therefore cannot be entirely certain of the rationale for the district court's decision.

Nonetheless, the court appears to have based the exclusion of Nelson's testimony upon two erroneous legal premises: 1) that admission of psychological testimony requires that the defendant suffer from a mental disorder; and 2) that an expert must be able to state conclusively that the defendant lacked the requisite mens rea in order to present testimony relevant to that issue. Admission under Fed.R.Evid. 702 requires neither mental disorder nor conclusive opinion.

### 1

In granting the government's motion, the district court commented that it had never seen a case where anyone "was entitled to give opinions about past mental state on people who don't even have mental disorders." To the extent this comment suggests that expert psychological testimony may only be introduced about those who suffer from a mental "disorder," it is an incorrect statement of the law. Nothing in Rule 702 or our

precedent implies such a prerequisite to admissibility. The district court erred in seeking to enforce a mental "disorder" requirement.

Importing such a prerequisite into Fed. R.Evid. 702 would flatly contradict Fed. R.Crim.P. 12.2. The latter rule, with which Rahm complied here, requires advance notice whenever "a defendant intends to introduce expert testimony relating to a mental disease or defect *or any other mental condition* of the defendant bearing upon the issue of guilt." Fed.R.Crim.P. 12.2(b) (emphasis added). If admission of psychological testimony under Fed.R.Evid. 702 required mental disorder, the reference in Rule 12.2(b) to "other mental condition" would be entirely superfluous. It is not. The advisory committee had testimony relating to "mental conditions" other than "disorders" specifically in mind when it introduced the broader term to Rule 12.2. *See* Fed.R.Crim.P. 12.2(b) 1983 amendment advisory committee's note. We must interpret Fed.R.Evid. 702 in concert with our other federal rules; under these rules, the proper ultimate inquiries are whether evidence of a defendant's mental condition has a "bearing upon the issue of guilt," Fed. R.Crim.P. 12.2, and whether expert testimony as to that condition "will assist the trier of fact to understand the evidence or to determine a fact in issue," Fed.R.Evid. 702. Neither inquiry requires determination of whether the condition merits the label "disorder."

Furthermore, we note that a rule establishing mental "disorder" as a prerequisite to the admission of expert psychological testimony would undoubtedly prove unworkable in an age when the psychological and psychiatric community is far from unanimous in its constantly-evolving conception of what constitutes "disorder." Even if a settled definition existed, there is no reason to believe that the scientific classification would bear particular relevance to the main admissibility issue under Rule 702—helpfulness to the jury. A district court may not exclude proffered expert psychological testimony simply because the defendant's condition does not fit within the expert's—or the district court's own—concept of mental "disorder."

2

In excluding Nelson's testimony, the district court apparently was also troubled by the lack of certainty in Nelson's conclusion regarding Rahm's inability to recognize that the currency was not genuine. In Nelson's report to Rahm's attorney, she stated that Rahm's perceptual difficulties and lack of insight "could" have resulted in a failure to examine closely any currency she found or to perceive signs of inauthenticity. Focusing upon the conditional "could," the district court commented that "that's not testimony that she lacked capacity, that's testimony that she had the capacity." By excluding expert testimony on this basis, the district court imposed a nearly impossible standard, supported neither in logic nor in law.

As an initial matter, we note that the admission of expert *testimony*, the issue involved here, and the admission of a specific expert *opinion* are separate determinations. Under the federal rules, an expert "may testify ... in the form of an opinion *or otherwise.*" Fed.R.Evid. 702 (emphasis added). Thus, not every expert need express, nor even hold, an opinion with regard to the issues involved in a trial. Indeed, in certain cases, we will not allow an expert to express an opinion as to specific issues even if he or she has formed one.[3] Thus, the decision whether to admit expert *testimony* does not rest upon the existence or strength of an expert's *opinion*. Rather, the key concern is whether expert *testimony* will assist the trier of fact in drawing its own conclusion as to a "fact in issue."

---

3. Nelson's testimony presents such a case. Under Fed.R.Evid. 704(b), an expert testifying as to mens rea in a criminal case may *not* "state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged." Effectively, then, the district court excluded Nelson as a witness because her report did not express a conclusive opinion—on whether Rahm knew that the ninety-nine bills were counterfeit— that she could not offer, even by inference, in her testimony at trial. It would make little sense to require a conclusive opinion in determining admissibility, and then absolutely to forbid expression of the opinion in testimony.

The trial court must consider the probativeness of expert *testimony* in determining its admissibility. Here, the district court focused exclusively upon the proffered expert's opinion, rather than considering the psychological test results underlying the opinion. In so doing, the court erred. It is the test results and the perceptual difficulties they demonstrate that would have comprised Nelson's testimony, and the court should have evaluated them in determining admissibility. The strength of an expert's opinion, to the extent he has one, may be one factor in determining potential helpfulness to the jury, but it is not dispositive. *See United States v. Brewer*, 783 F.2d 841, 842 (9th Cir.) (definiteness of opinion legitimately considered as one non-dispositive factor in determining admissibility of expert anthropological testimony), *cert. denied*, 479 U.S. 831, 107 S.Ct. 118, 93 L.Ed.2d 64 (1986). It is not, ordinarily, a suitable proxy for helpfulness of testimony to a jury, and a district court may not fail to consider the underlying testimony and focus exclusively on whatever opinion the expert may offer.

Furthermore, if the district court considers the strength of an expert's *opinion* in deciding whether to admit expert *testimony*, the court may not seek—or require—conclusiveness. "Absolute certainty of result is not required for admissibility." *Fleishman*, 684 F.2d at 1337; *see also id.* at 1336–37 (certainty of expert's opinion goes to weight of testimony, not admissibility).

Certainty is an unreasonable expectation in the realm of expert opinion. Nelson's use of the conditional "could" in expressing her conclusion is neither unusual nor disqualifying as to her testimony. In any area of science or social science, but particularly in matters of the mind, expecting an expert to reach a conclusion without the slightest doubt as to its accuracy is exceedingly unrealistic. Experts ordinarily deal in probabilities, in "coulds" and "mights." *See, e.g., Erskine*, 588 F.2d at 722 (excerpting proffer of expert testimony that defendant "in the realm of probability" committed crime without knowing what he was doing). It is the rare expert who is willing to opine conclusively about a past occurrence. The expert who expresses his opinion with absolute certainty invites skepticism about his candor or his qualifications. With good reason, we wonder whether such an expert is hiding—or missing—some significant factor. Here, Nelson's conclusion was simply couched in the probability terminology employed by experts.

The district court erred in two respects by excluding Nelson's testimony because her opinion was not entirely conclusive. First, the court improperly focused upon Nelson's opinion rather than the underlying proffered testimony, and, second, the court evaluated Nelson's opinion under an unreasonable conclusiveness standard.

B

Having concluded that the district court based its exclusion of expert testimony on two erroneous conclusions of law, we must determine whether the proffered testimony otherwise satisfies the requirements for admission under Fed.R.Evid. 702. We undertake this independent review because, as noted above, the basis of the district court's exclusion was not entirely clear, and because, despite the district court's legal errors, we will not reverse unless Nelson's testimony was otherwise admissible. *See* Fed. R.Crim.P. 52(a) (harmless error not cognizable on appeal); *United States v. Gonzales*, 749 F.2d 1329, 1336 (9th Cir.1984) (independently reviewing for adequate reasons to exclude where basis of trial judge's exclusion unclear). *Cf. Hingson v. Pacific Southwest Airlines*, 743 F.2d 1408, 1413 (9th Cir.1984) (no reversible error in civil case unless proffered expert testimony met Rule 702 requirements). We therefore consider each of the *Amaral* factors for admission of expert testimony.

Under *Amaral*, we first require that the testimony be offered by a qualified expert. The government did not challenge Nelson's qualifications to offer expert testimony; nor did the district court intimate any concerns in this regard. As a consequence, there is little in the record as to the psychologist's qualifications. Nonetheless, we conclude that Nelson's testimony would satisfy the first *Amaral* factor. She is apparently a clinical psychologist with a doctoral degree; her intended testimony related to psychologi-

cal tests and evaluation. The government would have been free to evaluate critically her further qualifications upon cross-examination or in argument. Any deficits in her qualifications beyond her professional training go to the weight of her testimony rather than to its admissibility. *See United States v. Bilson*, 648 F.2d 1238, 1239 (9th Cir.1981) (that psychiatrist was not licensed psychologist goes to weight not admissibility of testimony evaluating psychological tests). Nelson's testimony was not excludable under the first *Amaral* factor.

■ Our "proper subject" inquiry has generally focused upon whether the expert testimony improperly addresses matters within the understanding of the average juror. *See Christophe*, 833 F.2d at 1299; *Amaral*, 488 F.2d at 1152–53. We have stated that expert testimony should not "invade[ ] the province of the jury." *United States v. Binder*, 769 F.2d 595, 602 (9th Cir.1985). In recent years, noting that helpfulness to the jury is the central concern of Fed.R.Evid. 702, some scholars and courts have rejected this rationale for the exclusion of experts, concluding that jurors might find expert testimony helpful even in relation to subject matters from everyday experience. *See United States v. Langford*, 802 F.2d 1176, 1183 (9th Cir.1986) (Ferguson, J., dissenting) (discussing rejection of "jury function" rationale in relation to testimony on unreliability of eyewitness identifications); 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* § 702[02] (1992) (arguing that "common experience" rationale for exclusion is inconsistent with helpfulness inquiry). Nonetheless, this circuit continues to guard—perhaps too jealously—from expert elucidation, areas believed to be within the jurors' common understanding.

The government argues that, consistent with this principle, Nelson's testimony was inadmissible because it would simply have consisted of her opinion about the credibility of Rahm's "story." This contention fundamentally misinterprets our precedent. On occasion in the past, we have stated that expert testimony to bolster or impugn the credibility of a witness is properly excluded. *See, e.g., Binder*, 769 F.2d at 602 (expert testimony on specific child witnesses' ability to distinguish truth from falsity and reality

from fantasy); *Rohrer*, 708 F.2d at 434 (possible effects of drug usage by testifying witness); *Awkard*, 597 F.2d at 669–71 (effect of hypnosis on witness ability to recall). *But see United States v. Wesson*, 779 F.2d 1443, 1444 (9th Cir.1986) (upholding admission of expert testimony that "may have aided the jury in determining the credibility" of victim's claim). However, Nelson's proffered testimony was of an entirely different variety.

All defense evidence necessarily supports the defendant's "story"; that is its very purpose. If a defendant takes the stand to present his story, we could even loosely characterize the testimony of each additional defense witness as bolstering the "credibility" of the defendant's testimony. Nonetheless, we do not apply rules regarding credibility evidence to the testimony of each of these other witnesses. Here, Nelson's testimony related to the issue of knowledge, an element of the crimes with which Rahm was charged, and a "fact in issue" under Fed.R.Evid. 702. The testimony certainly would have enhanced Rahm's "credibility" had she taken the stand, but all evidence that supports a defendant's actual—or possible—testimony is not credibility evidence. The purpose of Nelson's testimony was not to comment upon Rahm's *truthfulness* in general or with respect to any account Rahm might offer as to how she came to possess the counterfeit currency. Rather, Nelson's testimony was intended to establish Rahm's diagnosed perceptual difficulties, which were relevant to a fact in issue—whether she knew the money was counterfeit. That Nelson's proposed testimony supports the defense theory is the reason it was proffered; it is *not* a reason for its exclusion.

■ Neither is Nelson's testimony improper because Rahm herself did not testify that she found the currency and did not know that it was counterfeit. The government argues that without other evidence of lack of knowledge, there was no "foundation" for introducing Nelson's testimony. In effect, the government suggests that Rahm was required to take the stand to present her "story" before she could present defense evidence to "corroborate" it.

██ The rule the government suggests would eviscerate several constitutional rights. Rahm, like all criminal defendants, had the right not to testify. By choosing not to testify, she did not forfeit her right to present a defense or to introduce testimony. Rahm had the right to the presumption of innocence. The government was required to prove each element of the crimes charged beyond a reasonable doubt. Defense testimony calling into question the proof of any such element is proper. Here, the government's proof of knowledge was entirely circumstantial; the prosecution asked the jury to *infer* knowledge from Rahm's possession of the ninety-nine bills and her attempt to use one of them for a purchase. Nonetheless, the government would deny Rahm the right to present circumstantial evidence of lack of knowledge and to present her own inferential argument—that perceptual difficulties, coupled with her remaining in the store for fifteen minutes, should lead the jury to infer that she *did not know* the money was counterfeit. The government is not entitled to such an unprecedented and unfair advantage. Nelson's testimony was not improper simply because Rahm herself had not testified to her lack of knowledge.

██ By other measures, Nelson's testimony also satisfies the second *Amaral* factor. Nelson would have interpreted the results of psychological tests; we have approved the introduction of expert testimony for such a purpose in the past. *See Bilson,* 648 F.2d at 1239. The average juror would not be capable of interpreting the WAIS–R or MMPI results. Moreover, Nelson's proffered testimony related to Rahm's specific perceptual difficulties, not to general human deficiencies that the jury could understand from their own experiences. *Cf. Miller,* 874 F.2d at 1267 (affirming exclusion of testimony consisting of generalities as to people's usual reaction to failing a polygraph); *Christophe,* 833 F.2d at 1300 (cross-examination and "appeals to the experience and common sense of jurors" sufficient to alert jury to conditions rendering eyewitness identification unreliable). *But cf. Binder,* 769 F.2d at 602 (distinguishing general testimony on problems common to all children from specific testimony regarding credibility of specific child witness-

es). Nelson's proffered testimony related to a proper subject.

██ Neither the government nor the district court expressed any reservations as to the testimony's conformity "to a generally accepted explanatory theory," the third *Amaral* factor. Nothing in the record suggests that Nelson's testimony would not satisfy this third requisite. Nelson's letter report suggests that the WAIS–R and MMPI are standardized tests in general use in the psychological profession. If so, the tests are generally-accepted procedures, admissible absent discrediting evidence. *See United States v. Hendershot,* 614 F.2d 648, 654 (9th Cir.1980) (upholding admission of shoeprint against challenge of technique absent presentation of discrediting evidence). Whether Nelson's conclusions from the test results are reliable is a separate issue; the government could refute Nelson's opinion through cross-examination and argument, or with its own expert testimony. *See United States v. Bowers,* 534 F.2d 186, 193–94 (9th Cir.) (whether use of generally accepted procedure resulted in reliable opinion in particular case is question to be explored in cross-examination of expert witness), *cert. denied,* 429 U.S. 942, 97 S.Ct. 360, 50 L.Ed.2d 311 (1976). The district court's exclusion of Nelson's testimony is not sustainable on the basis of the third *Amaral* factor.

██ Finally, we believe that the probative value of the proffered testimony was high, while the danger of unfair prejudice was not significant. Nelson's testimony was relevant to Rahm's knowledge that the bills were counterfeit. Such knowledge is an element of a violation of 18 U.S.C. § 472. *United ed States v. Palacios,* 835 F.2d 230, 232 (9th Cir.1987). The Secret Service special agent's testimony at trial indicated that the quality of the counterfeit bills possessed by Rahm was roughly average. Moreover, the agent specifically agreed that counterfeit bills of lesser-quality had been successfully passed off as real to the unsuspecting public. In light of this testimony, evidence that Rahm suffered from impaired perceptual ability would be highly probative as to the existence or absence of guilty knowledge.

Rahm did not and could not contest the fact that the bills were counterfeit, that she possessed the bills, and that she attempted to use one of the bills to make a purchase. Rahm's sole theory of defense was lack of knowledge. Knowledge was a "fact in issue" under Fed.R.Evid. 702. The proffered expert testimony addressed that issue specifically. If she had chosen to do so, Rahm herself could have testified to her lack of knowledge, but her testimony would not have related her atypical perceptual difficulties nearly as well as an expert's conclusions from psychological test results.[4] The proffered expert testimony had independent, significant probative value. *Cf. United States v. Darby,* 857 F.2d 623, 627 (9th Cir.1988) (proffered expert testimony meant to corroborate defendant's testimony regarding lack of intent should have been admitted).

Although there is always a danger of undue prejudice with expert testimony "because of its aura of special reliability and trustworthiness," *Amaral,* 488 F.2d at 1152, here that danger was minimal in comparison to the substantial probative value of Nelson's proffered testimony. Neither are our other concerns under the fourth *Amaral* factor and under Fed.R.Evid. 403—confusion of the issues, misleading the jury, undue delay, and needless presentation of cumulative evidence—at all implicated here. *See Amaral,* 488 F.2d at 1152 (listing countervailing considerations under fourth factor). Rahm's brief two-day trial would hardly have been complicated unnecessarily or lengthened unduly by allowing the defendant to present her defense of lack of knowledge. Nelson's proffered testimony satisfies the last *Amaral* factor.

We conclude that there was no justification for excluding the proffered expert testimony. The district court's decision rested upon two incorrect legal conclusions and the testimony was otherwise admissible under the test established in *Amaral.*

## C

We now determine whether the district court's error was harmless. Under our test for nonconstitutional error, which we apply to errors as to the admissibility of expert testimony, we must reverse unless it is more probable than not that the error did not materially affect the verdict. *See United States v. Echavarria–Olarte,* 904 F.2d 1391, 1398 (9th Cir.1990).[5] We conclude that the erroneous exclusion of Nelson's testimony was not harmless.

In moving to exclude Nelson's testimony, the government obviously was concerned about the testimony's possible effect on the verdict. We think the government's fears were justified. The circumstantial evidence of knowledge presented by the government was significant but not overwhelming, particularly in light of Rahm's having remained in the store after having been informed of problems with the currency. Nelson's testimony was highly probative of the defense Rahm sought to advance. It is true that Rahm *might* have been convicted even if Nelson's testimony had been introduced, but we cannot say that that hypothetical outcome is "more probable than not."

Our conclusion finds further support in the fact that the district court's error deprived Rahm of her sole intended defense. *Cf. United States v. Hartfield,* 513 F.2d 254, 258 (9th Cir.1975) (absence of mental examination "could have seriously prejudiced" defendant because only available defense turned on mental condition). As discussed above, Rahm's only possible defense was lack of knowledge; she chose to present that defense through Nelson's expert testimony regarding her perceptual difficulties. She had

---

4. Furthermore, as we discuss above, nothing requires a defendant to give up the right not to testify in order to admit expert testimony. Thus, even if Rahm could have conveyed her perceptual difficulties as well as the psychologist, she still would have had the option of introducing expert testimony rather than her own.

5. In this circuit, we have also sometimes described the test for harmless nonconstitutional error as requiring a "fair assurance" that the error did not have "substantial influence" over the verdict. *See United States v. Webbe,* 755 F.2d 1387, 1389 (9th Cir.1985). We therefore have a conflict in this circuit, which "can, in some cases, lead to conflicting results." *United States v. Hitt,* 981 F.2d 422, 425 & n. 2 (9th Cir.1992). Like *Hitt,* however, this is not such a case, as we conclude that the error was not harmless under either test.

a right to choose to present her defense exclusively through that testimony. The district court's error was not harmless.[6]

## IV

We conclude that the district court erroneously excluded Rahm's proffered expert testimony. In requiring that expert psychological testimony relate to a mental "disorder," and in requiring that the expert have a conclusive opinion, the district court imposed legally-erroneous standards. The expert testimony was admissible under the test established in *Amaral.* The error was not harmless. We reverse and remand for proceedings consistent with this opinion.

REVERSED AND REMANDED.

NOONAN, Circuit Judge, dissenting:

The evidence in this case was as follows:

On the afternoon of Saturday, August 3, 1991, Sharon Rahm entered the Canton Bazaar, 616 Grant Avenue, San Francisco. She ordered a box of tea costing $2.99 and offered to pay for it with a $100 bill. The store manager, Jason Boon Cheok, who was standing by the cashier, told Rahm that he would need to get change and would need to check on the bill. He went to another part of the store where he called the Secret Service, having reached the conclusion that the bill was counterfeit. He was told to call 911. He returned to Rahm and told her that he couldn't find change and that he was having "some trouble with the bill." Rahm said that she did not see "why there should be any problem with the bill because she just withdraw it from Wells Fargo Bank three days ago." Cheok then went up to the main floor and called 911. There were at least 15 minutes when Rahm could have left the store without being stopped by Cheok.

A San Francisco police officer, Walter Chan, came to the store, having heard on the police radio that there was a problem at the Canton Bazaar. He put Rahm under arrest for possession of a counterfeit bill. He then searched the purse carried on her shoulder. The purse contained 98 $100 bills and nothing else. Elsewhere she carried $25 in genuine currency.

Russell Nelson, a secret service agent, testified that all 99 $100 bills were counterfeit. They were not printed on Crane paper, as genuine United States currency is. They did not have red and blue security fibers, as United States currency has. A number of the bills had the same serial numbers, whereas real currency has unique serial numbers. Unlike genuine currency, the bills had microdots made by an office color-copying machine. In Nelson's opinion the chance of the bills passing inspection at a bank were slim to none. They were highly passable in a shopping mall during a holiday season with temporary help in the stores. In his opinion it was characteristic of counterfeiters to buy merchandise of small value with counterfeit bills of high denomination and to get the change in genuine currency.

The government rested after the testimony of Cheok, Chan and Nelson. The defense offered no evidence. To the jury the defense argued that the hole in the government's case was that Rahm did not attempt to leave in the fifteen minutes that Cheok was absent from the cashier's stand. Rahm could easily have walked away and did not, even though she knew the bill was being questioned. The defense also suggested the jury examine Cheok's motivation—he might have been looking for a reward or for help in getting his family into the country from Malaysia.

The prosecution told the jury they could infer Rahm's intention from the circumstances. She had a purse containing nothing but counterfeit bills. She had gone shopping for $3 worth of tea with almost $10,000 in cash on her person. The prosecution appealed to the common sense of the jurors to decide whether she knowingly and intentionally had passed the counterfeit bills and possessed the 98 other counterfeit bills.

### THE EVIDENCE EXCLUDED

Prior to trial, the defense offered the report of Arvolea J. Nelson of the Berkeley Therapy Institute, who had "initiated a psychological evaluation" of Rahm. Dr. Nelson administered to her the Wechsler Adult In-

---

6. We note that Rahm also challenges the exclusion of Nelson's testimony as a violation of her constitutional right to present a defense. Be-
cause we reverse on the basis of the nonconstitutional evidentiary error, we do not reach this contention.

telligence Scale—Revised Test and the Minnesota Multiphasic Personality Inventory. The "most significant discrepancies from an otherwise average scoring pattern occurred on the Picture Completion and Picture Arrangement subtest" of the first test. The Picture Completion subtest required Rahm to examine a set of pictures, each of which had an important detail missing. The task was to identify what was missing. Rahm did so poorly that had she scored similarly on the rest of the subtests, her overall IQ would have been about 50. The score suggested that she had "difficulty perceiving and interpreting visual details." On the Picture Arrangement subtest, her scale score was 8, below the average score of 10. The task was to arrange cartoon-like pictures to tell a logical story. She missed four out of 10 items. She showed a consistent tendency "to overlook important visual details." In both subtests "her ability to attend to the test material appeared to be impaired by a tendency to answer according to her first impression rather than allowing herself to consider multiple hypotheses."

Dr. Nelson concluded: "The results of the Minnesota Multiphasic Personality Inventory suggest that Ms. Rahm's intellectual 'blind spots'" may be characteristic of an overall personality style which is marked by lack of insight. Her two highest scale scores were Hypochondriasis and Hysteria. Such scores characterize people who deny the psychological factors underlying problems such as their multiple chronic physical complaints. They tend to be overly optimistic and unrealistic about their own situations and the world in general."

The government moved to exclude the proffered testimony. Defense counsel argued that Dr. Nelson could "testify about my client's mental-psychological condition, which involves poor visual perception, and that, I think, has a bearing on the issue in this case. The defense in this case, [I] make no secret about it, is lack of knowledge." The defense argued further that Rahm was not the kind of person "to look at things closely," not because of any physical defect, but rather because of "a mental perception problem that she has." The defense characterized this problem as "a mental irregularity," not "a psychiatric disorder."

The court observed: "I have never seen a case where anybody, including a mental health professional, was entitled to give opinions about the past mental state of people who do not even have mental disorders. It seems to me to be sheer speculation, and the notion that the so-called irregularity would have relevance just doesn't appear to me to be the threshold that it is admissible as testimony or opinion testimony.... I don't think you have made a threshold to meet 702 of the rules."

## ANALYSIS

The sole issue on appeal is whether the court erred in excluding the psychologist's proffered testimony. It was offered under Fed.R.Evid. 702, which reads as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Such testimony is subject to the trial court's decision as to whether the jury can receive "appreciable help" from such testimony. *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir.1972). It was a judgment call of the district court as to whether the jury would receive appreciable help from Dr. Nelson's opinion. The only authority offered to the district court by the defense was *United States v. Darby*, 857 F.2d 623 (9th Cir.1988). In *Darby* psychiatric testimony would have been helpful in deciding whether an accused bank robber possessed the capacity to form the requisite intent, but the district court made an error of law when it held that culpable intent was irrelevant. *Darby*, 857 F.2d at 722. The district court's first response to the testimony proffered here was as observation based on a concession made by the defendant: she did not have a mental disorder. Consequently, as the court implied, the proffered testimony could not bear on her capacity to form a specific intent. *Darby* didn't work.

The district court's second comment was that the proffered opinion did not reach the threshold, *i.e.* that the court did not see how

the expert opinion could be "appreciably" helpful to the jury. The opinion of this court fails to focus on this point. A careful reading of Dr. Nelson's opinion shows that she found Rahm to have not a "perceptual problem" based on her eyesight but a personality problem that made her overhasty and unrealistic. Most jurors, I would imagine, would not find such opinion evidence helpful in deciding whether Rahm knew she had a great quantity of counterfeit bills in her possession, carefully isolated from her genuine currency. If she couldn't tell the difference, why did she segregate the bills? Just conceivably, the jury would have been marginally helped, but appreciably? It is hard to say so. In any event, the admissibility of expert testimony is committed to the broad discretion of the trial court and the court's action will not be disturbed unless "manifestly erroneous." *Salem v. U.S. Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *United States v. Demma,* 523 F.2d 981, 987 (9th Cir.1975). We seriously distort our law when we intrude on the trial court's discretion and hold its ruling to be manifestly erroneous.

Even then, the alleged error does not require a new trial. The circumstantial evidence against Rahm was strong. If one assumes that she had very poor sight, if one assumes that she could scarcely see at all, her lack of vision would not explain why she came with a purse filled with 98 counterfeit $100 bills, nor why she kept the genuine currency entirely separate, nor why she gave a false explanation to Cheok, nor why she tried to pass a counterfeit $100 bill to buy $2.99 worth of tea. None of these undisputed and converging circumstantial facts would have been affected by Dr. Nelson's testimony. Nor would they have been affected if we assume that the testimony should be understood as bearing on some psychological capacity of Rahm's rather than on her eyesight. Her mental irregularity, her intellectual blind spots, her tendency to act on first impressions, do not account for her possessing the purse with its special contents, nor her segregation of the genuine bills, nor her lie about the bank as the source of the bill, nor her use of the bill to buy tea. The opinion of this court invokes the standard of harmless error but misapplies it.

Rahm's knowledge was so incontrovertibly established by what she did and by what she said and by what she carried on her person that it is far more probable than not that any jury would have found her guilty in spite of Dr. Nelson's opinion.

Rahm goes on to argue that denial of the psychologist's testimony was a violation of her Sixth Amendment right to present a defense. The majority does not reach this contention, but I necessarily do. Dr. Nelson was the only witness she intended to offer. When Dr. Nelson was excluded at the beginning of the trial she had no evidence at all. Every defendant has the right to present her own witnesses to establish a defense and to present her version of the facts. *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967) (murder defendant denied due process when one convicted of the same murder was not permitted to testify).

Applying this rule, we have reversed a conviction for bank robbery when testimony was excluded that another man matching the robber's description might have committed the crime. *United States v. Armstrong,* 621 F.2d 951, 953 (9th Cir.1980). But as we later explained:

> We reversed because the district court had made an error in applying [the Federal Rules of Evidence]. Mention was made of neither the sixth amendment nor due process. Nothing in *Armstrong* supports a belief that the Federal Rules of Evidence are constitutionally required, or that the Constitution requires admission of all relevant evidence.

*Perry v. Rushen,* 713 F.2d 1447, 1451 (9th Cir.1983), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984).

The raising of Rahm's claim to a constitutional level does not make it meritorious. The error was harmless because it did not affect the verdict. It consequently does not call for a new trial and does not call for reversal because of constitutional error. Rahm had a fair opportunity to present whatever evidence she had that would indicate her absence of guilt, and she had a fair opportunity to have the facts in the case argued to the jury. The Constitution does

not require the admission of all the evidence a defendant might desire to present. *Id.* Rahm was denied a witness, not a defense.

The majority's intrusion into a district court's discretion and the aberrational application of the rule of harmless error may do no permanent damage to the structure of the law. They will surprise those familiar with the case. Justice, as Benjamin Cardozo long ago reminded us, is symmetrical. *Palko v. Connecticut,* 302 U.S. 319, 328, 58 S.Ct. 149, 153, 82 L.Ed. 288 (1937). The prosecution deserves its due just as much as the defendant. *Snyder v. Massachusetts,* 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934). Our duty is "to keep the balance true." *Id.* Because the prosecution has not received its due here, I dissent.