**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David Peter MARSH, Defendant–
Appellant.**

**No. 92–10504.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 3, 1993.

Decided June 27, 1994.

Diane Marie Amann, San Francisco, CA, for defendant-appellant.

Rory K. Little, Asst. U.S. Atty., San Francisco, CA, for plaintiff-appellee.

Before: CANBY and NOONAN, Circuit Judges, HUFF *, District Judge.

Opinion by Judge CANBY; Concurrence and Dissent by Judge NOONAN.

CANBY, Circuit Judge:

Following a jury trial, David Peter Marsh was convicted on one count of extortion or attempted extortion and sentenced to five years in prison. Marsh now appeals his conviction, contending that the evidence was insufficient to support the conviction for extortion by threat of economic harm and that the district court erred in instructing the jury and in preventing him from introducing expert testimony regarding the complaining witness's "dependent personality disorder." Marsh also appeals his sentence, arguing that the district court erred in departing upward from the guidelines.

We affirm Marsh's conviction. We vacate the sentence, however, and remand for resentencing.

## BACKGROUND

Marsh was indicted for attempting to extort and for extorting money from a San Francisco businessman, whose privacy we will protect by referring to him only as "Doe." The extortionate threats were alleged to have been made in the course of a series of telephone calls made by Marsh to Doe, and recorded on Doe's answering machine. The indictment contained three counts: Count I, alleging threats of economic harm in telephone calls made on September 4, 1991; Count II, alleging threats to kill in calls of October 7, 1991; and Count III, alleging threats to kill in calls of October 9, 1991. The jury convicted Marsh on Count I, but acquitted him on Counts II and III. This appeal consequently focuses on the calls of September 4, 1991. Because the meaning of those calls is disputed, and because the jury was entitled to interpret the meaning of those calls in light of all the evidence, we set forth excerpts of several of the other calls as well. We also relate the history of the relationship between Marsh and Doe.

Marsh and Doe first met more than 25 years ago when Doe responded to Marsh's newspaper advertisement for male models. On more than one occasion thereafter, Doe engaged in a sexual relationship in which he paid Marsh for prostitution. Eventually, a friendship developed. Doe, who lived in San Francisco, and Marsh, in Los Angeles, saw each other three or four times a year. Although the relationship remained sexual, Marsh no longer required payment for sex. Marsh often asked Doe for money and Doe was "glad to help him out." Doe's financial support of Marsh grew to be substantial and Marsh eventually became financially dependent on him. For a short time, Doe employed Marsh in his business. However, Doe kept his relationship with Marsh a secret.

Doe operated a business selling a line of specialty items out of his residence in San Francisco. His primary customers were hotels, including the Fairmont and the St. Francis. In the spring of 1991, Doe's sales began to decline and he was forced to accept a part-time job with a fraternal organization, the Scottish Rite, to supplement his income. He was fired a short time later, allegedly because of Marsh's numerous calls to the organization's office.

During 1991, Doe had borrowed over $20,000 from his family, apparently to continue to provide money to Marsh. On September 1, 1991, Doe, now an elderly man, attempted suicide and was hospitalized for 10 days. After the suicide attempt, family members discovered why Doe cut his wrists. Said Doe, "I was all out of money." Eventually, concerned family members learned about his relationship with Marsh. Suspecting that Marsh was criminally blackmailing Doe, they contacted the F.B.I.

When criminal proceedings began, the two men had not seen one another for about four years. However, they had maintained a constant relationship by telephone. Typically, Marsh called Doe collect and requested Doe to call him back at one of several pay phones

* The Honorable Marilyn L. Huff, United States District Judge for the Southern District of California, sitting by designation.

in the Los Angeles area. During the ensuing conversations, Marsh usually requested Doe to wire him money via Western Union. The pattern of Doe's payments to Marsh was peculiar and erratic. On a single day in April of 1991, for example, Doe sent Marsh nine separate payments via Western Union in amounts ranging from $35 to $145. When Doe's ability to pay began to decline, the tenor and frequency of Marsh's phone calls began to change. The messages Marsh left on Doe's answering machine became violent and threatening.

After his family members contacted the F.B.I., federal agents instructed Doe to save the telephone messages that Marsh had been leaving on Doe's answering machine. Marsh left the first of the recorded messages on September 4, 1991, the date on which this appeal focuses. In the first message, Marsh said, "Please have a hundred dollars down here in 15 minutes. Or I'll be ... on my way to San Francisco." A few minutes later he called again:

> Yeah, I just found out you might be in the country for the week. Well, that's fine, [victim's name]. I'll break into your place. But, uh, so don't worry about that. I'll, I'll, I'll find a way in. Now second of all, um, I'll be calling the Thurman [an apparent mistranscription of Fairmont, one of Doe's customers] Hotel ... and, uh, St. Francis, and I'll find a location (unintelligible), um, if you don't want to help me, at a time that ... you put me in this fucking spot, you've put me in this miserable motherfucking spot, Mister. So I'm gonna ... put you in the same spot back.... I've just got done calling the Scottish (unintelligible) and leaving a message. Uh, Steve (unintelligible) ... Marsh and I'm going to call the Thurman Hotel. And then I'm gonna call ... (unintelligible) and I'm gonna call Ev ... [end of message].

In the third message, Marsh apologized but asked Doe again to send the money he had requested earlier. These three calls formed the basis for Marsh's conviction on Count I of the indictment, extortion and attempted extortion by wrongfully threatening economic loss in violation of 18 U.S.C. § 1951.

On October 7, 1991, Marsh left eight messages on Doe's machine. In the first, at approximately 1:00 a.m., Marsh asked for $100 and said that Doe was "the most caring and kindest person that I've ever met in my life." Marsh called back again several hours later saying that the money had not arrived and that he was being "chewed out," apparently by his landlord for not having the rent money. Marsh's tone was angry and he threatened to continue calling every few minutes or even seconds. Ten minutes later, Marsh called again, threatening in course terms to clog up Doe's telephone line. In the next message, an hour-and-a-half later, Marsh hurled numerous epithets at Doe and concluded by saying "Just get ready to die,.... I'm going to kill ya." Minutes later, Marsh called again and said "You don't deserve to live. I'm comin to San Francisco. When I get up there you're gonna die." And so on.

An hour later Marsh called and resorted again to pleading for the money. Minutes later he called back yet again begging and pleading for money. In the final message five-and-a-half hours later, Marsh insulted Doe's mother and his religion. He also claimed that he had a knife with which he planned to stab a woman at a real estate agency.

These October 7 calls formed the basis for Count II of the indictment, of which Marsh was acquitted. Count II alleged extortion and attempted extortion through the use of threatened force, violence or fear, as distinguished from the economic threat alleged in Count I. Count III essentially mirrored Count II, except that it was supported by four messages Marsh left on October 9, 1991.

In the first of these October 9 messages, Marsh said that he was desperate for money and told Doe to call him back right away. If Doe did not comply, Marsh threatened:

> "I might call the Triple A up right now. I'm gonna call the Fairmont Hotel, the Shriner's Hospital. I'm gonna call, I'm gonna call every single mother fucker that I know and every person you do business with. I will call every account that you have."

Triple A was one of Doe's suppliers. In the next message, three minutes later, Marsh called Doe a pig and his mother a liar. In another message, Marsh stated, "I'm going to kill you.... I'm going to kill you with my own bare hands. I'm comin' to San Francisco." He then added expletives and additional threats to kill. In the final message, Marsh said he was being threatened with a knife and implored Doe to call.

Marsh was soon arrested and indicted on the three counts of extortion or attempted extortion. Shortly after trial was under way, the defense filed a motion seeking permission to inspect Doe's psychiatric records and to force Doe to submit to a psychiatric examination. Marsh argued that this evidence would support his defense that Doe gave Marsh money not because of the threats, but because of an independent motive; Marsh alleged that Doe had a "dependent personality disorder" that caused him to give Marsh the money. The district court denied the motion because it lacked foundation.

Later, the defense proffered expert testimony regarding Doe's psychiatric condition. The expert, who had been observing Doe's testimony during trial and had read the trial transcripts, was prepared to testify that Doe might possess a dependent personality disorder. The district court denied this motion as well.

At the end of the trial, the government submitted jury instructions drawn from the Ninth Circuit jury instruction manual and a standard treatise. The defense requested an additional jury instruction to clarify that the government must prove that Doe feared "economic loss, not simply a fear of loss of reputation." The district court refused to give the modified instruction. However, the defense made no objection to the instructions that were given. After deliberating for approximately three hours, the jury sought additional guidance on whether the "harm" required under Counts II and III might include exposure or defamation. According to the defense, the jury's uncertainty indicated a misunderstanding of the distinction between "fear of exposure" and "fear of economic loss" as those terms applied to Count I. The district court, however, refused to reinstruct the jury. When the jury returned, it acquitted Marsh of Counts II and III (threats to life) and convicted him on Count I, which alleged threats of economic harm on September 4.

At sentencing, the district court calculated the base offense for Marsh's conviction at 11. Citing numerous factors not adequately considered in the Sentencing Guidelines, the judge then departed sharply upward, imposing a total sentence of five years.

Marsh now appeals both the conviction and the sentence.

## DISCUSSION

### I. Sufficiency of the evidence.

#### A. Standard of review.

We review the sufficiency of the evidence under the *Jackson* standard. "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ The elements of economic extortion are (1) a threat of economic harm that is (2) made with the purpose of obtaining money from the victim (3) that puts the victim in reasonable fear of economic harm. *United States v. Greger,* 716 F.2d 1275, 1278 (9th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). Marsh first argues that the evidence is insufficient to support a conviction for extortion under Count I because the evidence failed to establish that Doe possessed a reasonable fear of economic harm. We agree that the evidence is insufficient to establish a reasonable fear of economic harm based on the September messages; although Doe freely testified to fear for his life, he simply was not asked whether he feared economic harm. Nevertheless, Count I also alleged *attempted* extortion, and the jury was instructed on its elements.

■ An extortion conviction requires evidence that Doe possessed a reasonable fear

of economic harm. For attempted extortion, on the other hand, "the victim's state of mind is not important. What is important is that the defendant attempted to instill fear in the victim." *United States v. Ward,* 914 F.2d 1340, 1347 (9th Cir.1990). Consequently, we must affirm Marsh's conviction of attempted extortion if the facts are sufficient that a rational jury could find that Marsh had the intent to extort money and that he took a substantial step to accomplish this end. *See United States v. Runco,* 873 F.2d 1230, 1232 (9th Cir.1989).

In interpreting threatening statements, we give considerable deference to juries, especially if the speaker's words are ambiguous. *United States v. Pascucci,* 943 F.2d 1032, 1036–37, n. 3 (9th Cir.1991) ("Especially when ambiguous, the existence of a threat depends on the circumstances, which the jury interprets"). When considering the meaning of Marsh's words on September 4, the jury was entitled to take into account all of the evidence properly admitted.

■ On September 4, Marsh left a message, telling Doe to "have a hundred dollars down here in 15 minutes. Or I'll be ... on my way to San Francisco." Minutes later, he called again, saying (among other things), "I'll be calling the Thurman [an apparent mistranscription of Fairmont, one of R's customers] Hotel ... and, uh, St. Francis ... you put me in this fucking spot, you've put me in this miserable motherfucking spot, Mister. So I'm gonna ... put you in the same spot back.... I've just got done calling the Scottish (unintelligible) and leaving a message."

A reasonable interpretation of these statements is that Marsh was threatening economic harm when he said he would call Doe's customers and his employer. It can scarcely be doubted that the purpose of the calls was to obtain money from Doe. Marsh's statements demonstrate that he was facing a difficult economic situation. He threatened to put Doe in the "same spot back." A rational jury could have inferred intent to instill a fear of economic harm from these words.

The fact that Marsh did not specify what he would say to Doe's business customers does not necessarily militate against a find-

ing that he attempted to instill a fear of economic loss; the jury could easily draw from Marsh's many communications that he was a loose cannon and might say almost anything damaging to Doe. Although the jury, if it had chosen to do so, might reasonably have inferred that Marsh attempted to instill only a fear of embarrassment, the jury was equally entitled to infer as it did that Marsh intended to instill a fear of economic harm, especially in light of Marsh's threat to put Doe in the "same spot back." This fear would have been reasonable. After all, Marsh targeted Doe's customers, not his friends.

The jury was entitled also to consider Marsh's October statements to determine the meaning of the September 4 conversation. In the midst of a scatological diatribe in one of the messages on October 9, Marsh said, "I might call Triple A up right now. I'm going to call the Fairmont Hotel, the Shriner's Hospital. I'm gonna call every single mother fucker that I know *and every person that you do business with. I will call every account that you have.*" These statements certainly sound like an economic threat. The jury could rationally have determined that Marsh's similar statements in September reflected an intent to instill fear of economic harm in Doe.

The only benign interpretations of Marsh's statements are that he somehow did not intend the natural meaning of his words or that he somehow abandoned his attempt when he followed some of the threatening calls with apologetic ones. Doe's long relationship with Marsh could have supported an inference that Marsh's economic threats were not intended to be taken seriously, but the jury refused to make that inference. The jury was entitled to interpret the circumstances and the meaning of Marsh's words and whether the relationship became abusive toward the end. And although voluntary abandonment is a valid defense to an extortion attempt, Marsh failed to present such a defense to the jury.

In addition to providing ample evidence of Marsh's intent, the phone calls are unequivocal and substantial steps in furtherance of

the extortion attempt. Undisputed evidence supports the jury's conclusion that Marsh attempted to obtain money from Doe by instilling "economic" fear in him.

## II. Jury instruction.

■ In evaluating a challenge to jury instructions, we must determine whether "the jury instructions as a whole are misleading or inadequate to guide the jury's deliberations." *United States v. Joetzki,* 952 F.2d 1090, 1095 (9th Cir.1991). Although a district court has substantial latitude to tailor jury instructions, the instructions must fairly and adequately embody the relevant law regarding the issues presented. *United States v. Powell,* 955 F.2d 1206, 1210 (9th Cir.1991).

■ Marsh sought to supplement the court's instruction on "extortion-fear of economic loss" with a statement clarifying that "the fear must be a fear of economic loss, not simply a fear of loss of reputation." Although the district court refused to give the amended instruction, the defendant failed to object to the instructions as given.

At trial, the defense maintained that Doe never feared for his livelihood. It theorized, rather, that Doe feared exposure. In instructing the jury, the district court clarified that Marsh would not be guilty of extortion unless the jury found a wrongful threat of economic harm. Although the court did not give an instruction distinguishing fear of economic loss from fear of loss of reputation, the instruction it gave was not inconsistent with the theory of the defense. Nor did it preclude the defense from arguing its theory. Because the proposed jury instructions were not erroneous, the district court did not err in rejecting Marsh's requested instruction.

■ Marsh next asserts that a note from the jury during deliberations demonstrated the jury's confusion as to the district court's instructions regarding Count I. In a note to the judge, the jury asked whether the word "harm" in Counts II and III referred to fear of "economic loss, or exposure, defamation,

etc." However, the jury had stricken out the words "economic loss." According to Marsh, the fact that the jury struck through the words "economic loss" proves that the jury equated economic loss with exposure [apparently of Doe's homosexuality or homosexual encounters]. In response to the note, the district court brought the jury back to the courtroom and questioned the members about the note. The court asked the jury foreperson whether the jury was concerned about Count I. The jury foreperson assured the judge that the jury was concerned with Counts II and III only. Satisfied that the questions pertained to Counts II and III only, the district court refused to reinstruct the jury regarding Count I. In view of the district court's efforts to insure that the jury was not confused regarding Count I, Marsh has failed to convince us that the jury's questions regarding Counts II and III had any bearing on their understanding of the proof on Count I. Any errors in instructing on Counts II or III are harmless because Marsh was acquitted of those counts.

## III. Expert psychiatric testimony.[1]

We review for abuse of discretion the district court's refusal to allow an expert to testify regarding a witness's psychiatric condition. *United States v. Rahm,* 993 F.2d 1405, 1409–10 (9th Cir.1993).

The defense proffered the testimony of an expert witness to establish that Doe had a "dependent personality disorder." The defense asserted that the expert testimony was relevant "because it provides a basis for arguing that—that it's because of the nature of the relationship that he was giving [Marsh] the money and not for some other reason." The district court denied the motion, refusing to allow the expert to testify.

■ Marsh argues that our decision in *United States v. Rahm,* 993 F.2d 1405 (9th Cir.1993), requires reversal. We reject that contention for two reasons. The first reason

---

1. Marsh's request to conduct a psychiatric examination on the victim was unsupported by any authority. Because the victim's competency to testify was not in dispute, Marsh had no legal basis to compel the victim to undergo a psychiat- ric examination. We "have never held that the defense may compel witnesses to be examined." *Gilpin v. McCormick,* 921 F.2d 928, 931 (9th Cir.1990).

is that, because we affirm the conviction on the basis of attempted extortion rather than extortion, the proffered expert testimony is greatly diminished in importance. Marsh sought to introduce evidence regarding Doe's "dependent personality disorder" to prove that Marsh's telephone calls had not instilled the requisite fear in Doe. As we noted earlier, the crime of attempted extortion requires no examination of the victim's state of mind. *See Ward,* 914 F.2d at 1347. Consequently, the trial court's decision to exclude the testimony had relatively little effect on the attempt conviction. Any relationship between the proffered psychiatric evidence and Marsh's state of mind in making his economic threats is far too attenuated to compel its admission.[2]

Second, the nature of the relationship between Marsh and Doe was fully set out for the jury. It was uncontested that for most of the 24 years of that relationship, Doe's payments to Marsh were voluntary. The jury was quite able to evaluate Marsh's harsh messages in light of that relationship,[3] as is well evidenced by its acquittal of Marsh on the counts alleging threats to Doe's life. At least with respect to the crime of attempted extortion, the district court in the exercise of its discretion properly could have concluded that the expert evidence would not have been of assistance to the jury. *See United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir. 1973); Fed.R.Evid. 702.

## IV. The Sentence

■ We review *de novo* a district court's decision to depart upward for "unusual circumstances." *United States v. Lira–Barraza,* 941 F.2d 745, 746 (9th Cir.1991) (en banc). We review related factual findings for clear error. *Id.* If an invalid factor is considered in sentencing, we must remand for resentencing unless we conclude "on the record as a whole, that the error was harmless, *i.e.,*

that the error did not affect the district court's selection of the sentence imposed." *Williams v. United States,* —— U.S. ——, ——, 112 S.Ct. 1112, 1121, 117 L.Ed.2d 341 (1992).

The district court characterized Marsh's behavior as "cruel and ruthless" because Marsh knew of Doe's advanced age, 79, and his fear of exposure. The court also found "extreme psychological injury," citing Doe's "attempt[s] to commit suicide on two occasions." Further, the court found that because of Marsh's efforts to obtain money by extortion, Doe "lost substantial assets and business. He is now living in a home for the aged." Additionally, the court considered Marsh's anti-Semitic language and "the threats to harm [Doe's] mother."

■ The record fails to support the existence of several of the facts that the court cited in support of its upward departure. As far as the record shows in this case, no payment of money to Marsh by Doe was involuntary prior to September 4, 1991. The factor that the court referred to more than once, Doe's impoverishment, apparently was not caused by Marsh's threats. According to Doe's own testimony, most of the money that he gave Marsh was given voluntarily because Doe "was glad to help him out." As Doe told the probation officer, over the course of 24 years he had given Marsh about $200,000. Doe sought a part-time job in May of 1991 because his own business had deteriorated. According to his own testimony and that of his niece, he was still voluntarily providing support to Marsh at that time.

In departing from the Guidelines a court must "limit its consideration of psychological injury to the counts of conviction." *United States v. McAninch,* 994 F.2d 1380, 1387 (9th Cir.1993). Each of the two suicide attempts on which the court relied to find "extreme psychological injury" preceded the crime of

---

**2.** In *Rahm,* the expert testimony regarded the defendant's mental capacity to know whether the currency she was attempting to pass was counterfeit. *Rahm,* 993 F.2d at 1414. The proffered testimony in the present case concerning the nature of the relationship between Doe and Marsh bears far less directly on Marsh's intent in threatening to contact Doe's customers.

**3.** Again by way of contrast, in *Rahm* the evidence regarding interpretation of tests was beyond the understanding of the average juror; "[m]oreover, Nelson's proffered testimony related to Rahm's specific perceptual difficulties, not to general human deficiencies that the jury could understand from their own experiences." *Rahm,* 993 F.2d at 1414.

which Marsh was convicted. One such attempt was not established at trial. The record fails to divulge when it occurred except that, according to the district court's statements at the sentencing hearing, it preceded the September 1, 1991 attempt that was discussed at trial. Doe attempted suicide on September 1, not necessarily because of Marsh's alleged extortion attempts, but because he had run out of money. At this point, he had run out of money not because of any extortion alleged or proven by the government but because he voluntary gave Marsh large amounts of money.

The district court was inaccurate as to other facts as well. For example, Marsh made no actual threat to injure Doe's mother; she had been dead for ten years. And although Marsh's anti-Semitic outburst was truly offensive, it occurred on October 7, 1991, and was part of the basis for Count II of the indictment. Marsh was acquitted of that count. Consequently, the insulting language is not an independent justification for an upward departure in this case.

On the basis of these clearly erroneous facts, the district court imposed a sentence two-and-a-half times as great as that specified by the Sentencing Guidelines for the offense level found by the district court. Because of the number of errors and the magnitude of the departure, we are confident that errors cannot be harmless. Accordingly, we must vacate this sentence and remand for resentencing.

### CONCLUSION

The government failed to elicit the testimony from Doe that would be necessary to support a conviction for the completed crime of extortion. However, the record is sufficient to affirm the conviction for attempted extortion; a rational trier of fact could have found beyond a reasonable doubt that Marsh attempted to extort money from Doe by threatening to call his customers. The district court's jury instructions in this case were adequate. Only at the sentencing phase did the district court commit reversible error. Consequently, we AFFIRM the conviction, VACATE the sentence and REMAND for resentencing.

NOONAN, Circuit Judge, concurring and dissenting:

"The defendant before you is an innocent man." That claim, rarely heard in a court of appeals and still more rarely sustained, compels the attention of the judge. All our provisions for appeal, our careful scrutiny of the record, our hearing of argument, our conferencing and analysis are designed to prevent just such a perversion of the criminal process as the infliction of punishment upon an innocent person. It is not our way to imprison a defendant because we do not like him or find his conduct worthy of disapproval. If he is to be stamped a felon by federal law, he must have committed a federal crime. If he has not, he is innocent. Such Marsh contends he is. Such Marsh should be found to be.

Marsh was charged with three crimes, of two of which he was acquitted by the jury: extortion and attempted extortion on October 7, 1991 by threatening to kill Doe, and extortion and attempted extortion on October 9, 1991 by threatening to kill Doe. He was convicted of extortion and attempted extortion on September 4, 1991 by "wrongfully threatened fear of economic loss" to Doe. This court now finds the evidence insufficient to convict him of extortion on September 4.

I concur in this conclusion and elaborate on it as follows: To obtain a conviction of extortion by threat of economic loss the government had to prove that Doe had an economic loss he could sustain. No evidence was presented that Doe was actively in business in September 1991. Doe was 79 years of age. His business had evaporated with a change in public feeling about the taste he catered to. He had a telephone with an answering machine. In 1991 he received no business calls upon it. He had obtained a part-time job with a fraternal organization to support himself, and he borrowed from his relatives. There is no evidence that he had any customers to lose. By Doe's own testimony his only work now was "office work," not selling a product.

It may be asked, Why, then, did Marsh refer to the St. Francis and the "Thurman"?

The answer, it may be suggested, was habit. Marsh and Doe were playing an old game, as will be more fully discussed below. Whatever Marsh's thoughts, he could not have been guilty of extortion if the underlying facts made the crime impossible. A man is not guilty of murder if he assaults a corpse. Marsh was not guilty of economic extortion if he threatened a defunct business.

Did Marsh even attempt to threaten the dead business? Given that Marsh knew a good deal about Doe and his affairs, it seems unlikely that he did, but the majority, holding Marsh guilty of an attempt, finds that a reasonable juror could have found that he did make this attempt. To reach this conclusion, one must conclude that there was presented to the jury evidence establishing beyond a reasonable doubt that Marsh took a step toward making an economic threat and that he had the intention of creating fear in Doe by making the economic threat.

As an initial proposition there is considerable difficulty in reaching this conclusion because the evidence that Marsh attempted extortion on September 4 is the same evidence that he did commit extortion on September 4, viz., a single sentence in a stream of messages left on a telephone answering machine. If this single sentence did not constitute a threat of economic loss, could it constitute an attempt to threaten economic loss? If Marsh lacked the requisite intent to commit extortion, could he have had the requisite intent to attempt extortion?

The law of attempt has developed in connection with physical crimes like bank robbery. The man with a gun who trips as he enters a bank may readily be found to have been in the course of an attempt upon the bank. Extortion, in contrast, is a crime committed by words. When the words are not coercive enough to create fear, it is hard to understand how they nonetheless were an attempt at extortion. The court notes that Doe was never asked if Marsh's message made him fear economic harm. Hence, without any evidence at all of the effect of the communication upon the person it was intended for, the jury was supposed to assess the intentions of the message-sender. To make that determination in such a vacuum was very difficult to do without a reasonable doubt about the message's meaning.

Beyond these difficulties, there are two further obstacles to any rational juror concluding that Marsh was attempting extortion:

First, Marsh's reference to one or two hotels could not have been an attempt to instill fear of economic loss even if (as was never shown) the hotels had still been active customers of Doe. It is a matter of common knowledge that a gay life style is accepted in public office in San Francisco. Marsh could not have believed that Doe, a former salesman wise in the ways of the world, would think hotels doing business with the public in San Francisco would have discontinued business with Doe because he had a male friend. It is unproven that Marsh would have thought that Doe would believe that he could disrupt the business relations of Doe, if any, by stating on the telephone to an unknown hotel employee that he, Marsh, was Doe's close friend, had twenty-four years ago sold sex to him, and had a criminal record. Doe's vague apprehensions of what Marsh might say certainly reflected the embarrassment of an old man brought up in an era when homosexual practices were kept quiet. Playing on Doe's embarrassment and anxiety does not amount to threatening fear of economic loss.

Second, no rational trier of fact could have understood the single sentence that is now made the basis of Marsh's conviction as standing alone without context. The immediate context is provided by the three messages left on Doe's answering machine on September 4. These messages were as follows: The first message said, "Please have a hundred dollars down here in 15 minutes. Or I'll be . . . on my way to San Francisco. Uh, this is no . . . game and no joke right now . . . . this is real serious. I had a gun to my head." The second message, left six minutes later, said, "I'll break into your place. . . . I'll find a way in. Now second of all, um, I'll be calling the Thurman Hotel . . . and, uh, St. Francis . . ." The message continued, "[I]f I lose my life, it's on your conscience." The third message, sent three hours later, said, "Doe, I'm sorry for being an asshole this morning, would you please do

that for me Doe? Sorry for being an asshole. Could you please do that for me?"

No one supposes that it is reasonable to break a phrase out of a sentence, or a sentence out of a paragraph, and quote the isolated words without reference to their context. To isolate a single line from a flow of continuous communications is like taking a sentence out of the paragraph that qualifies it. No trier of fact could rationally understand this single sentence without reference to what precedes and follows it. The communications of September 4 show that Marsh was bluffing at all times. He said he had a gun at his head, that it was no game and no joke, but he knew Doe would not believe he would kill himself in fifteen minutes if he didn't get the money. The last communication of the day contains an explicit acknowledgment of the silliness of his earlier messages. In the context of the answering machine tape, the single sentence is not a threat.

The larger context of the long relationship of Marsh and Doe, and Doe's method of keeping Marsh dependent upon him, is also essential to an understanding of what the communication of September 4 meant. No rational trier of fact could ignore this larger context or, taking it into account, find that for the first and only time in a twenty-four-year relationship Marsh had attempted to threaten with economic harm the man who viewed him as a friend, nuisance, beneficiary, and co-dependent. The facts of that relationship as they emerged at trial, always considered from the standpoint most favorable to the government, were as follows:

Doe met Marsh twenty-four years before the trial in Los Angeles, when Doe responded to a newspaper advertisement for male models. Doe then engaged in a sexual relationship with Marsh, paying him money for prostitution. The transaction was repeated the next two or three times Marsh had contact with Doe. Thereafter a friendship developed between Doe and Marsh and they saw each other three or four times a year, usually for a period of two to five days. These occasions were marked by a sexual relation and, in addition, Doe enjoyed

Marsh's personality. He considered Marsh a "very good friend."

After the initial occasions on which Doe paid money for sex, he did not specifically compensate Marsh in exchange for sex but, over the years, Marsh "consistently asked for money." Doe was "glad to help him out." To the question asked by the government, "If he asked, you would send him some money?", the response was affirmative. For a period of several months Doe also employed Marsh in his business. In Doe's opinion, Marsh was financially dependent on Doe.

The pattern of giving by Doe to Marsh was peculiar. Money was dribbled in small amounts by Western Union. The method chosen by Doe incurred substantial transaction expenses in order to send small amounts. The following transfers by Doe to Marsh were introduced at trial:

| | |
|---|---|
| April 5, 1991 | $100 |
| April 5, 1991 | $ 35 |
| April 5, 1991 | $145 |
| April 5, 1991 | $ 45 |
| April 5, 1991 | $ 65 |
| April 5, 1991 | $ 65 |
| April 5, 1991 | $ 60 |
| April 5, 1991 | $ 50 |
| April 5, 1991 | $ 45 |

There are hundreds of similar transfers from Doe to Marsh, continuing into the period of the alleged extortion. The first transfers to Marsh after the messages of September 4, 1991 are as follows:

| | |
|---|---|
| September 13, 1991 | $85 |
| September 13, 1991 | $85 |
| September 13, 1991 | $65 |

Similar multiple transfers to Marsh by Doe were made each day on September 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30 and October 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18. Not a single one of these transfers of money were proved to be involuntary, extorted, or in response to a threat of economic loss.

Doe's telephone played an important part in the Doe–Marsh relationship in at least the last several years. For three and one-half years preceding the events in the case they had not seen each other. Doe lived in San Francisco, Marsh in Los Angeles. They stayed in touch by phone. The phone was the phone in Doe's apartment. It was his

only phone. The person who called collect—the only person as far as the evidence shows—was Marsh. Doe maintained the phone, at least in part, to talk to Marsh and respond to his requests for money.

The regular pattern was for Marsh to call collect. If Doe was not at home, the machine took the message, and Doe returned the call to the number left by Marsh. Normally the number was that of a pay telephone in Los Angeles. Doe's telephone bill for the first part of 1991 shows over a hundred calls made by him to pay phones in Los Angeles. The calls were made to Marsh. They were made, as far as all the evidence goes, voluntarily by Doe.

In the spring of 1991, when Doe's business had fallen away, Marsh's requests for money did not stop, and Doe continued to meet them. As a consequence, Doe's bills were not paid. Doe's niece was aware that her uncle had been giving Marsh money for several years and advised him to discontinue paying Marsh. She took over the paying of her uncle's bills because she knew if she gave the money to him he would send it to Marsh.

During 1991, while Doe never saw Marsh, he continued in close telephone contact, typically calling Los Angeles and accepting collect calls from Marsh on his San Francisco telephone. Up until the beginning of September 1991 Doe had sent Marsh $24,000 in 1991 alone. None of this large sum was shown to have been sent in response to any threat of economic loss.

On September 1, 1991 Doe cut his wrists in a suicide attempt and was hospitalized. To the question asked by the government as to what had led him to the attempt, Doe replied, "I was all out of money." Doe could no longer maintain the contact with Marsh by giving him money. His desperation, for all that appears, was emotional.

As a consequence of his hospitalization his niece and nephew-in-law contacted the FBI. The FBI thereafter monitored the messages recorded on Doe's answering machine. Without the intervention of his relatives Doe would never have taped Marsh or have become a witness against Marsh. Without their intervention, Doe was content to culti-vate Marsh's calls, dole out money to him, and accept his whining and abuse. Say the relationship was unwholesome if one wishes to enter upon a moral judgment. The relation was not criminal. A single sentence blurted out in a single telephone message did not make it so, nor did the sentence constitute a crime in itself.

*The Excluded Evidence*

Marsh proffered the testimony of Dr. Arvalea Nelson, an experienced psychologist, to show that Doe suffered "from a dependent personality disorder ... a co-dependent type relationship in which both members were getting something out of the relationship and both members were involved in the relationship voluntarily." The government objected that such testimony would not be relevant; that the testimony would not go to an essential element of the crime. The court suggested the testimony was being offered "on the issue of the credibility of the victim;" that, in other words, Doe "could not have experienced the fear that he's testified to." The government remarked, "That's certainly not the proffer." The court stated: "Well, I don't see otherwise its ... use." Marsh explained that the expert's opinion would be that "it's because of that relationship Mr. Doe is giving Mr. Marsh money and continues to do that." The court accepted this explanation, saying: "The purpose of the expert testimony [is] ... to describe the relation, to show that it was because of the nature of the relationship and not because of ... fear, that the money was given." The court then excluded the proffered testimony.

This court now holds that the evidence proffered was not relevant because to prove attempted extortion the government had only to show Marsh's state of mind, not Doe's. But the purpose of Marsh's proffer was to prove *the relationship*, a relationship that bore on his state of mind as much as on Doe's. If Nelson's testimony had been admitted, it would have shown both Marsh and Doe engaged in voluntary transactions. Marsh's words would have been interpreted in context not as extortion but as, Marsh put it, an exchange "in which both members were getting something out of the relationship."

It was error to exclude Nelson. *United States v. Rahm,* 993 F.2d 1405 (9th Cir.1993). *Rahm* is peculiarly apt because in that case, too, the testimony of Dr. Arvalea Nelson was proffered by a criminal defendant, and the district court was found to have erroneously and prejudicially excluded it, necessitating a retrial. In *Rahm,* the proffer went to the defendant's ability to recognize forged currency. Here the proffer went to an even more sensitive psychological issue, the nature of the Marsh–Doe relationship.

A body of scientific and specialized knowledge now exists as to the kind of relation Marsh had to Doe. While no doubt there are some popular views as to its nature, it is scarcely contestable that the testimony of an expert would have been helpful in evaluating Marsh's state of mind. For example, it is recognized by expert opinion that such a close relation creates a dyad—the two act as one—and the dynamism of a dyad is distinct from the actions of isolated individuals. A dyad constructs a narrative to explain the relationship and to absorb the negative elements that always threaten the positive side of intimacy. *See* Sandra L. Murray & John G. Holmes, *Seeing Virtues in Faults: Negativity and the Transformation of Interpersonal Narratives in Close Relationships,* 65 J. Personality & Soc.Psychol. 707, 720 (1993). That Marsh in his harsh taunts played to a side of Doe that welcomed such treatment and in no way feared or resented it could also have been illustrated by expert opinion. *See* William B. Swann, Jr. et al., *Allure of Negative Feedback: Self–Verification Strivings Among Depressed Persons,* 101 J. Abnormal Psychol. 293, 294 (1991). Expert testimony would equally have shown that the discomfort experienced by Doe at the idea of any disclosure of his secret relation to Marsh was not economic fear, nor did Marsh intend it to be, but that what Marsh teased him with was the loss of a secret precious because it was "an obsessive preoccupation," especially dear for being a secret one. *See* Daniel M. Wegner et al., *The Allure of Secret Relationships,* 66 J. Personality & Soc.Psychol. 287, 297 (1994). That Marsh was a man, engaged in a sexual and psychical relation with another man, made his case particularly appropriate for expert testimony. If Marsh had been a woman asking her lover for financial aid of a kind he had given her for twenty-four years, it is difficult to imagine that she would have been indicted, let alone have been convicted and sentenced to five years of imprisonment.

Not all of the relevant scientific data is beyond dispute, *see, e.g.,* the critique of Swann et al. by Lauren B. Allay & Alan J. Lipman, *Depression and Selection of Positive and Negative Social Feedback: Motivated Preference or Cognitive Balance,* 101 J. Abnormal Psychol. 316 (1991). But under the interpretation of Rule 702 of the Federal Rules of Evidence which is now established law, the testimony of an expert psychologist on these matters should have been admitted. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993). The district court committed error not only under *Rahm* but under *Daubert.*

The error was not harmless. It deprived Marsh of his best way of persuading the jury that his words were not threats but an old game that both he and Doe knew well. If Marsh is not to be held innocent by this court, at the very least he is entitled to a new trial.

I concur with the majority that Doe's sentence was excessive, out of all proportion to the crime of conviction, and illegal under the Sentencing Guidelines.