

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-1-2009

# USA v. Parkin

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-4085

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Parkin" (2009). *2009 Decisions.* Paper 1609.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1609

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-4085

UNITED STATES OF AMERICA

v.

HARRY G. PARKIN,
                                             Appellant
(D.C. Crim. No. 04-cr-00162)

On Appeal From The United States District Court
for the District of New Jersey
District Judge:  The Honorable Garrett E. Brown, Jr.

Submitted Under Third Circuit LAR 34.1(a)
November 19, 2008

Before:  BARRY, CHAGARES, <u>Circuit Judges</u>, and COHILL, Jr.,<sup>*</sup> <u>District Judge</u>

(Opinion Filed: April 1, 2009)

OPINION

COHILL, <u>Senior District Judge</u>.

_____

<sup>*</sup>  Honorable Maurice B. Cohill, Jr., Senior United States District Judge for the Western District of Pennsylvania, sitting by designation.

Defendant Harry G. Parkin appeals his conviction for twelve counts of mail fraud, in violation of 18 U.S.C. §§ 1341, 1346 and 18 U.S.C. § 2, and one count of attempted extortion in violation of 18 U.S.C. § 1951(a). We will affirm.

## I.

Harry G. Parkin is an attorney and former prosecutor for Mercer County, New Jersey. From 1995 to December 31, 2003, Parkin served as the Chief of Staff to Robert Prunetti, the Mercer County Executive. Among other things, Parkin served as the County Executive's liaison to the governing board of the Mercer County Improvement Authority ("MCIA"). The MCIA is an autonomous agency within Mercer County established to conduct municipal finance and oversee development projects for the County. Relevant to this case, the MCIA is the agency responsible for overseeing the solid waste and recycling collection programs in the County.

The contract for curbside recycling pickup in Mercer County was due to expire at the end of 1999. The MCIA was unhappy with the current contractor, Waste Management, and put the contract up for bid. After Waste Management was the only bidder, Parkin contacted the Executive Director of the MCIA, James Lambert, to let him know that a top contributor to the Republican Party, Alex Abdalla, was interested in bidding on the contract. The MCIA decided to rebid the contract. The only bidders in the second round were Waste Management and Abdalla's company, Central Jersey Waste & Recycling ("CJW&R"). The contract was awarded to CJW&R.

2

In July 2000, Lambert resigned from the MCIA and joined CJW&R as its President. Due to CJW&R's financial difficulties Abdalla and Lambert approached Parkin to ask him to invest in CJW&R. Parkin desired to join forces with Lambert and Abdalla so that each would become a one-third owner of the company. However, he wanted to conceal his interest in the company due to his position as Chief of Staff of the Mercer County Executive and because CJW&R had the recycling contract with the County. Parkin sought to conceal his interest in CJW&R by first drafting a stock-option agreement providing for Lambert to purchase a two-thirds interest in CJW&R from Abdalla. Parkin's actual, concealed one-third interest in the company would be protected through a secret side agreement he would have with Lambert. This deal eventually fell through.

To help with CJW&R's financial difficulties, Parkin agreed to loan the company $150,000 at a 15% interest rate, but again sought to conceal his interest in the company. This was accomplished through the use of a sham loan showing that Parkin was loaning $150,000 to PMT Contracting Company, a company owned by Abdalla's nephew. The $150,000 was actually given to CJW&R, and payments on the loan were made from the company's funds to Parkin. Parkin failed to disclose the source of interest income he received from the loan on mandatory state ethics disclosure forms for calendar year 2000, and failed to file any forms for calendar year 2001.

Thereafter, Parkin, Lambert, and Abdalla sought other avenues to enable each of

3

the three men to gain a one-third ownership interest in the company. At the same time, however, Abdalla sought financing from other persons, in particular, Frank Fiumefreddo and his son. The Fiumefreddos loaned CJW&R $250,000 in exchange for an option for 51% ownership in the company and the right to manage CJW&R.

After the Fiumefreddos took over management responsibilities, Abdalla decided he did not like the new arrangement. Meanwhile, Parkin was concerned that the interest payments on his loan might stop under the Fiumefreddos management. He thus began to plan to have Lambert, Abdalla, and himself buy out the Fiumefreddos' interest in the company.

In order to ensure that Abdalla had sufficient funds to accomplish a buyout, Parkin sought to have a demolition contract to demolish buildings on South Broad Street in Trenton awarded to Abdalla's company. To accomplish this, Parkin told the new Executive Director of the MCIA, Steven Dixon, that he wanted the contract awarded to Abdalla's company. After two rounds of bidding, the Deputy Executive Director to the MCIA recommended to Dixon that the contact be awarded to the company that had proffered the low bid each time. Instead, Dixon rebid the contract two more times, and both times CJW&R did not have the low bid. Dixon then gave CJW&R, but not the low bidding company, a final opportunity to bid. Abdalla submitted an undated, amended bid directly to Dixon and his company was awarded a $33,300 contract for the South Broad Street demolition project.

4

As part of his responsibilities as Chief of Staff for the Mercer County Executive Parkin also oversaw a potential redevelopment project at the Trenton-Mercer Airport. Parkin attempted to have an airport demolition contract, worth between $1,000,000 and $1,400,000, awarded to CJW&R. Parkin sent Lambert to inform Abdalla that in order to get the airport demolition contract, Abdalla would have to agree to get rid of the Fiumefreddos and allow Parkin to obtain an ownership interest in CJW&R. However, the company responsible for development of the site was unable to obtain financing and the airport redevelopment deal fell through.

Parkin also employed threats in an effort to force the Fiumefreddos to sell their interest in CJW&R. Parkin attempted to accomplish this plan by threatening to require the elder Fiumefreddo to undergo the New Jersey Department of Environmental Protection's licensing approval process to obtain a license to operate a waste hauling company. This approval was necessary if Fiumefreddo ever wanted to exercise his option to purchase 51% of CJW&R. Up to this point, Fiumefreddo had not sought approval, apparently because of alleged ties to organized crime that had caused Fiumefreddo to give up ownership interest in waste hauling companies in New York City. As part of this plan, Parkin instructed an MCIA employee named Jerry Fiabane to investigate the elder Fiumefreddo's background and report directly back to Parkin so that he could use the information as leverage. Parkin then instructed Fiabane to meet with the Fiumefreddos to inform them that Fiabane had information about the elder Fiumefreddo's ties to organized

5

crime and would have to forward that information to the authorities.

Parkin also sought to force the Fiumefreddos to sell their interest in CJW&R by threatening to withhold the 2003 renewal of the initial recycling contract, an action that would effectively destroy the company. To accomplish this plan, Parkin instructed Fiabane to tell Lou Calisti, the MCIA employee responsible for sending out the contract renewal, to hold up the renewal process. Parkin then instructed Abdalla to inform the Fiumefreddos that the contract renewals were in jeopardy as long as they remained with the company. Finally, Parkin himself told the elder Fiumefreddo not to count on the contracts being renewed.

On March 11, 2004, a federal grand jury returned a thirteen count indictment against Parkin alleging twelve counts of mail fraud and one count of extortion. The government alleged that from September 2000 through March 2003, Parkin devised a scheme to defraud the citizens of Mercer County of their right to honest services by using his official position to obtain contracts for CJW&R in order to protect and advance his own financial interests; by attempting to obtain an ownership interest in CJW&R; and by concealing material information concerning his financial interests in CJW&R from other government officials and the public.

Trial commenced with jury selection on February 1, 2005. Before opening statements, Parkin requested permission to proceed as co-counsel along with his attorney David Rhoads, Esquire. The District Court, in its discretion, denied the motion for hybrid

representation.

During a break in the government's direct examination of its second witness, Parkin requested permission to proceed *pro se*. The District Court conducted a hearing on the matter and granted Parkin's request. Parkin represented himself for the remainder of the trial. At the close of the government's case, and again at the close of evidence, Parkin moved for judgment of acquittal under Federal Rule of Criminal Procedure 29, which the District Court denied.

On March 21, 2005, the jury returned a verdict of guilty on all thirteen counts. On August 30, 2005, Parkin was sentenced to 90 months' imprisonment, a term of 3 years' supervised release, and a fine of $26,000. He now appeals.

## II.

We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the District Court's ruling that the defendant's waiver of his Sixth Amendment right to legal counsel was knowing, intelligent, and voluntary. United States v. Peppers, 302 F.3d 120, 127 (3d Cir. 2002). We also exercise plenary review over the District Court's denial of a motion for judgment of acquittal. United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005).

We review the sentence under an abuse of discretion standard to ensure that the district court "committed no significant procedural error in arriving at its decision." Gall v. United States, 552 U.S. —, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007). "If we

determine that the district court has committed no significant procedural error, we then review the substantive reasonableness of the sentence under an abuse-of-discretion standard . . . ." United States v. Wise, 515 F.3d 207, 218 (3d Cir. 2008) (citing Gall, 128 S.Ct. at 597.)

## III.

### A.

Parkin's first argument is that the District Court erred in granting his request to represent himself at trial. We find no error.

Our review of the District Court's extensive colloquy with Parkin shows that Parkin's waiver was knowing, voluntary, and intelligent. Parkin concedes that the District Court "conducted an exhaustive examination of [Parkin], in accordance with Faretta v. California, 422 U.S. 806 (1975) and its progeny . . . ." (Appellant's Br. at 21.) His argument is squarely focused on his assertion that his waiver of the right to counsel was not voluntary because he was coerced into *pro se* representation based on the District Court's denial of his request for hybrid representation.[1]

---

[1] Parkin also argues that his waiver of the right to counsel was not knowing and intelligent because he had not engaged in the practice of law for the past eight years, he had not participated in a federal trial since 1986, and he was not familiar with the Sentencing Guidelines. As the government points out, valid waivers of the right to counsel are regularly made by defendants who are not attorneys and who have never practiced criminal law. Moreover, "technical legal knowledge" is "not relevant to an assessment of [a defendant's] knowing exercise of the right to defend himself." Faretta, 422 U.S. at 836.

As noted, the District Court in its discretion denied Parkin's request to act as co-counsel alongside Rhoads. He does not challenge that ruling, and admits that it was a matter left to the court's discretion. When Parkin, through Rhoads, informed the District Court that he wished to proceed *pro se*, the District Court undertook a careful and exhaustive inquiry into the matter.

First, the District Court asked Rhoads to formally place the request on the record. (Defendant's Appendix, "D.A.", at 64.) After Rhoads stated his understanding that Parkin wished to proceed as his own counsel, the District Court immediately acknowledged that its next responsibility was to "find out what the defendant's current position is and what it is that he wants to do." (Id. at 69.) The District Court then briefly set forth the applicable law regarding a waiver of the right to counsel, placed Parkin under oath, and asked him if he wanted to discharge Rhoads and take over his own defense. Parkin answered that he did. The Court then undertook an inquiry with Parkin as to why he wanted to proceed *pro se*, and Parkin explained at length his reasons. Rhoads again stated that his client wished to proceed *pro se* and that he was in agreement with this decision.

The attorney for the government offered his view that Parkin's request to proceed *pro se* was not clear because on one hand it seemed as if Rhoads was saying that the attorney client relationship had broken down, and on the other hand that it would be acceptable to Parkin if Rhoads was appointed as his standby counsel. In response,

9

Rhoads stated:

> It's very, very clear. Mr. Parkin made an application to be co-counsel. It was denied. We're not even going to revisit that at this point. He is now saying to this Court he wants to proceed *pro se*. I am totally in agreement with that. Our situation is such that I don't have his confidence -- or perhaps I should say I don't have the confidence that I have his confidence in my being his defense attorney. He is a defense attorney. All I suggested to the Court, and Mr. Parkin is in agreement, that I would act as standby counsel. That's a far cry from co-counsel.

(D.A. at 84.) The District Court then asked Parkin whether he agreed with what Rhoads said, and Parkin replied that he did. Parkin further explained as follows:

> The Court ruled on our previous motion which is what we think we would have liked to have seen. Now we cannot be there at the preferred place. Now we are moving into a different mode because this is the only way that I can achieve and we can achieve what we want to do, an opportunity to allow me to participate in the defense. The Court has said the only way that will happen is if I am *pro se*. I would prefer co-counsel, but *pro se* is where we are right now, Your Honor, because that is the only alternative that's open.

(Id. at 86.)

At this point the District Court stated that it was going to conduct an inquiry into Parkin's request to proceed *pro se* and the waiver of his right to counsel. In consultation with the parties, it was decided that the hearing would take place the following morning.

When the hearing began, the District Court first set forth in great detail the procedural history relevant to Defendant's desire to serve as co-counsel and his current desire to proceed *pro se*. Thereafter, and again in great detail, the Court set forth the applicable law. Before beginning a colloquy with Parkin, the District Court cited

10

Parkin's apparent reluctance to proceed *pro se* in light of the Court's denial of his request to serve as co-counsel and thus questioned whether Parkin had clearly and unequivocally asserted his desire to proceed *pro se*. Parkin again stated his reasons for wanting to proceed *pro se*, and stated that because his request to proceed as co-counsel had been denied, that he was "faced with an issue of do I proceed *pro se* or do I proceed with Mr. Rhoads as my attorney?" (Id. at 124.) Thus, the question of to what extent the District Court's denial of the request for hybrid representation influenced Parkin's decision to proceed *pro se* was at the forefront of the colloquy.

The Court then conducted a thorough and searching inquiry. Relevant to the instant issue of voluntariness the District Court asked Parkin the following general questions:

> Q. Are you making this decision freely and does it represent your personal desire?
>
> A. Yes.
>
> Q. Is this decision a result of any compulsion or coercion?
>
> A. No.

(Id. at 150.) The District Court then specifically asked Parkin about the effect the Court's prior denial of his request for hybrid representation had on Parkin's decision to proceed *pro se*:

> Q. The cases have indicated that hybrid representation is disfavored as I have said before. Your decision to represent yourself, is that influenced by my denial of the right of hybrid representation.

11

A.  Certainly.

(Id. at 151.)  The District Court then asked a more direct question:

Q.  . . . .  So in other words this is not a free and voluntary decision because it is you say made because I denied you the right to appear together with Mr. Rhoads, is that right?

A.  I disagree with that, Judge.  This is a free and voluntary decision based on the rulings of the Court and the facts that we are facing right at this particular point in time.  I don't disagree with the Court's ruling.  The Court had the discretion to make that ruling, you've made it.  Now we're moving on to how do we proceed in light of the Court's ruling?  I don't think we can sit here and say the Court's ruling had nothing to do with what we're doing here today.

Q.  But you're not saying that this is a compelled decision or involuntary decision because the Court has ruled?

A.  I didn't say that.

Q.  Okay.  That's my question because I have to make a determination whether this is a free and voluntary decision and you're telling me it is free and voluntary, is that right?

A.  Yes.  Sure.

(Id. at 151-52.)

Parkin clearly indicated that he was distinguishing between whether the Court's prior ruling was a *factor* in his decision to voluntarily proceed *pro se* and whether the Court's prior ruling *compelled* him to decide to proceed *pro se*.  He unequivocally stated that his decision was voluntary and was not compelled.  Parkin was faced with the constitutionally acceptable choice of either proceeding with counsel who was prepared and competent, or proceeding *pro se*.  The District Court correctly found that Parkin's

12

decision was knowing and voluntary.

**B.**

Parkin next argues that the District Court erred in failing to grant his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 on all thirteen counts.

"A motion for judgment of acquittal should be denied if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Jimenez, 513 F.3d 62, 72 (3d Cir. 2008) (citing United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005).

Parkin argues that the evidence was insufficient to establish honest services mail fraud in several ways. First, he argues that a scheme to defraud was not established because there was insufficient evidence showing official action in relation to CJW&R as opposed to evidence regarding official action relating to awarding contracts to Abdalla's demolition company. He further argues that the evidence was insufficient to show a scheme to defraud in that the scheme to steer demolition contracts to Abdalla in exchange for an ownership interest in CJW&R was a legal impossibility because Fiumefreddo owned 51% of the stock. Similarly, he argues that it was a legal impossibility for Parkin to steer the airport contract to Abdalla since the awarding of that contract would occur by a private company. Finally, Parkin argues that the evidence was insufficient in that the evidence showed that Parkin did not have control or influence over the MCIA.

The evidence was sufficient to establish that Parkin took official actions that furthered his undisclosed interest in CJW&R. The government presented evidence that Parkin attempted in a variety of ways to get the Fiumefreddos to sell their interest in CJW&R in order to ensure that he continued to receive interest payments on his loan and to secure his own interest in CJW&R. Parkin furthered these goals by instructing Fiabane to withhold renewal of the CJW&R contract, by instructing Fiabane to conduct an investigation into the elder Fiumefreddo's alleged ties to organized crime, and by instructing Fiabane to meet with the Fiumefreddos to pressure them into relinquishing their ownership. In addition, Parkin furthered his concealed interest in CJW&R by using his position to try to steer demolition contracts to Abdalla's demolition company. These actions were undertaken in an effort to ensure that Parkin, Abdalla, and Lambert all had sufficient funds so that each could eventually purchase a one-third interest in CJW&R. The government supported this evidence with testimony from Abdalla, Lambert, and Fiabane, and with recorded conversations in which Parkin himself corroborated the evidence.

Parkin's allegation that the mail fraud schemes were impossible also fails. Mail fraud schemes need not succeed; the law is clear that the fraud is complete upon mailing. United States v. Frey, 42 F.3d 795, 800 (3d Cir. 1995). In addition, the mail fraud charges against Parkin charged not only the execution of the mail fraud schemes, but also the "attempt" to execute the schemes. By charging an attempt, the jury could premise

14

guilt on the defendant's intent to defraud even if the scheme was unsuccessful.

The evidence was also sufficient to establish that in fact it was not an "impossibility" that Parkin's scheme to steer contracts to Abdalla would further his goal of gaining an ownership interest in CJW&R. The Fiumefreddos did not own 51% of CJW&R. Instead, in exchange for investing $250,000 in CJW&R, the Fiumefreddos were given management control and had an option to purchase 51% of CJW&R. Parkin's scheme included an effort to get the Fiumefreddos to relinquish this interest, as well as efforts to ensure that Parkin, Lambert, and Abdalla had sufficient funds to buy the Fiumefreddos out. Thus, the plan was not impossible.

With regard to the airport demolition contract, the evidence was sufficient to allow the jury to determine that Parkin could influence the company that was in charge of awarding the demolition contract. The government introduced a tape recording of Parkin explaining that he could make the airport deal happen and that he had taken the necessary steps to ensure that it would happen. Finally, there was an abundance of evidence showing that Parkin was able to control the MCIA.

Next, Parkin argues that he should been granted judgment of acquittal on the sole charge of attempting to commit extortion under color of official right or by wrongful use of fear of economic harm because there was no evidence that the Fiumefreddos were ever in fear of economic harm. However, the District Court correctly instructed the jury, and Parkin did not object, that it was not necessary that the government prove the "actual

15

generation of fear." (Supplemental Appendix, "S.A.", at 629.) See United States v. Marsh, 26 F.3d 14965, 1500-01 (9th Cir. 2004) ("For attempted extortion, 'the victim's state of mind is not important. What is important is that the defendant attempted to instill fear in the victim.'") (quoting United States v. Ward, 914 F.2d 1340, 1347 (9th Cir. 1990)). The District Court properly denied Parkin's motion for judgment of acquittal.

## C.

Parkin's final argument is that the District Court erred in calculating his Sentencing Guideline range, and that the ultimate sentence imposed was unreasonable. We find no error.

The District Court applied U.S.S.G. § 2C1.7 to the mail fraud counts, and U.S.S.G. § 2C1.1 to the extortion count.[2] The attempted extortion count carried a base offense level of 10 pursuant to section 2C1.1(a). Eight levels were added pursuant to section 2C1.1(b)(2)(B) because the offense involved payments for the purpose of influencing a high-level public official, to arrive at a total offense level for the attempted extortion count of 18.

The mail fraud counts carried a base offense level of 10. Fourteen levels were added pursuant to section 2C1.7(b)(1)(A), based on a loss calculation of more than $400,000 but less than $1,000,000. Four levels were added pursuant to section 3B1.1(a)

---

[2] The 2002 edition of the Guidelines Manual was used in this case. Effective November 1, 2004, section 2C1.7 was consolidated with section 2C1.1.

16

for Parkin's leadership role in the offense as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. Thus, the total offense level for the mail fraud counts was 28.

By applying section 3D1.2 and section 3D1.3(b) to the two groups of offenses, the District Court arrived at an overall total offense level of 28. With a criminal history category of I, the District Court determined that the applicable advisory guideline range of imprisonment was 78 to 97 months.

Parkin first contends that the District Court should have applied section 2B1.1 to the mail fraud counts instead of section 2C1.7. We disagree. The Sentencing Guidelines indicate that for convictions under 18 U.S.C. § 1341, the appropriate guideline section to apply is either 2B1.1 or 2C1.7. U.S.S.G. App. A, at 472. In cases where more than one section is applicable for a conviction, the Guidelines direct courts to use the the most appropriate guideline section for the offense conduct of conviction. U.S.S.G. App. A, intro, at 463. Parkin was convicted of being a public official who deprived the citizens of Mercer County of their intangible right to honest services. Section 2C1.7 is titled in relevant part: "Fraud Involving Deprivation of the Intangible Right to the Honest Services of Public Officials," whereas section 2B1.1 more generally applies to larceny, theft, fraud, deceit, and other economic crimes. There is no doubt that the District Court applied the appropriate guideline section.

Parkin next argues that the District Court erred in adding four levels to his offense

17

level for being a leader of criminal activity that involved five or more participants. The five participants were Parkin, Abdalla, Lambert, Abdalla's nephew, and Fiabane. Parkin objects to the inclusion of Abdalla's nephew and Fiabane arguing that they were unwitting participants and were not criminally culpable. In addition, Parkin argues that there was no evidence that he exercised any control over Abdalla's nephew and Fiabane.

To be included as a "participant" in a criminal activity under section 3B1.1(a), one may either be criminally responsible for the charged offense or "used to facilitate the criminal scheme." United States v. Inigo, 925 F.2d 641, 659 (3d Cir. 1991). It is not necessary that the "participant" is guilty of the charged offense asserted against the defendant, "so long as their own criminal conduct made [commission of the offense] possible." Id.

The evidence demonstrated that Abdalla's nephew was aware that he entered into a written loan on behalf of his company but that the loan was not actually given to his company. He further understood that the purpose of the sham loan was to protect Parkin's interest in CJW&R. Thus, Abdalla's nephew was not an unwitting participant and in fact aided and abetted Parkin's criminal scheme.

As to Fiabane, the evidence shows that he took his instructions directly from Parkin in order to advance Parkin's scheme. Upon instruction from Parkin, Fiabane ensured that renewal of CJW&R contract was upheld, conducted an investigation into Fiumefreddo's alleged ties to organized crime, and met with the Fiumefreddos to pressure

18

them into relinquishing their ownership. Fiabane's actions were not the actions of an unwitting participant; rather, he aided and abetted Parkin's scheme. We find no error with the District Court's 4 level increase for Parkin's leadership role in criminal activity that involved five or more participants.

Next, Parkin argues that the District Court erred in calculating the amount of loss pursuant to section 2B1.1(b)(1)(H). The District Court calculated that the loss was greater than $400,000 but less than $1,000,000, resulting in a 14 level increase in Parkin's offense level.

Parkin argues that there was no evidence of government loss due to Abdalla receiving the $33,300 South Broad Street demolition contract. In addition, he argues that no loss value should be attributed to the airport demolition contract because the contract was never awarded and the government did not establish the value of the contract. Finally, Parkin argues that the government cannot rely on loss attributed to Parkin's scheme to obtain an interest in CJW&R because there was no evidence of the fair market value of CJW&R, and no evidence to support a reasonable valuation of the company. Therefore, Parkin argues, the District Court should have used as an alternative measure the gain that resulted from this offense pursuant to section 2B1.1 app.n. 2(B). Because the evidence showed no loss by the government, Parkin claims there should have been no increase in his base offense level.

The language of section 2C1.7, however, explicitly sets forth that a defendant's

base offense level will be enhanced by the greater of either the loss to the government or "the value of anything obtained or to be obtained by a public official or others acting with a public official." U.S.S.G. § 2C1.7(b)(1)(A). Specifically, this section provides as follows:

> If the loss to the government, or the value of *anything obtained or to be obtained by a public official* or *others acting with a public official*, whichever is greater (i) exceeded $2,000 but did not exceed $5,000, increase by 1 level; or (ii) exceeded $5,000, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

Id. (emphasis added). Here, Abdalla was acting with Parkin. Thus it was proper for the District Court to attribute as loss to Parkin not only the value of anything he himself obtained or he intended to obtain, but also the value of anything Abdalla obtained or that Parkin intended Abdalla to obtain. United States v. Antico, 273 F.3d 245, 271 (3d Cir. 2001).

As a result of Parkin's offenses Abdalla obtained or sought to obtain two contracts. The value of the South Broad Street demolition contract was $33,300 and the value of the airport demolition contract that Parkin attempted to steer to Abdalla was approximately $1,000,000. These two contracts together are sufficient to support the 14 level increase awarded by the District Court.

In addition, the amount of loss calculated for purposes of this enhancement is also supported by the value of the one-third interest in CJW&R that Parkin attempted to obtain for himself and the value of the one-third interest he attempted to obtain for Lambert.

20

The evidence in the record supports that the value of each one-third ownership interest attempted to be obtained was approximately $500,000, for a total amount of $1,000,000. We find no error with the District Court assigning a loss value under sections 2C1.7 and 2B1.1 greater than $400,000 and less than $1,000,000, and adding 14 levels to Parkin's base offense level.

Finally, Parkin argues that by not imposing the lowest range of the guideline sentence range, the sentence imposed by the District Court was not reasonable. He contends that the District Court failed to consider his personal factors, his service to the United States army, and his service to the community.

We reject Parkin's claim that his sentence is unreasonable. The District Court stated at sentencing as follows:

> This is a sad situation. Everything that I see indicates that before this period of time the defendant was [a] well respected, highly successful attorney, he served honorably in the nation's military and was respected by a number of people and indeed served as the person responsible for the ethics in the county.

(D.A. at 240.) The District Court noted that Parkin was "very highly respected," and that "[p]eople say a lot of good things about him . . . ." (Id. at 240.) The District Court read from a letter Parkin wrote to the Court in which Parkin cited his long years in public service as well as his military service. (Id. at 243.) The District Court considered this letter as well as "the letters of all the people that knew Parkin and spoke well of him." (Id. at 243.)

21

Our review of the entire sentencing hearing shows that the District Court gave thoughtful consideration to the sentencing factors in 18 U.S.C. § 3553(a) before pronouncing a reasonable sentence of 90 months of imprisonment, a sentence within the advisory guideline range of 78 to 97 months' imprisonment. United States v. Schweitzer, 454 F.3d 197, 204 (3d Cir. 2006) (Court of Appeals reviews a sentence under a standard that "requires a deferential review of the record developed by the district court to determine whether the final sentence, wherever it may lie within the permissible statutory range, was premised upon appropriate and judicious consideration of the relevant factors."); see also United States v. Cooper, 437 F.3d 324, 330-32 (3d Cir. 2006).

**IV.**

For the foregoing reasons, we will affirm the District Court's judgment of conviction and sentence.